BOSTON GAS COMPANY *vs.* ASSESSORS OF BOSTON
(and twenty-three companion cases[1]).

Suffolk.    April 5, 1956. — September 24, 1956.

Present: WILKINS, C.J., WILLIAMS, COUNIHAN, & WHITTEMORE, JJ.

*Taxation,* Personal property tax: machinery, valuation, abatement; Gas company; Electric company; Appellate Tax Board: appeal to Supreme Judicial Court, findings, rehearing. *Value. Witness,* Expert witness. *Evidence,* Opinion: expert; Of value, Competency.

A claim of appeal to this court from a decision of the Appellate Tax Board was seasonably filed with the clerk of the board under G. L. (Ter. Ed.) c. 58A, § 13, as appearing in St. 1933, c. 321, § 7, as amended, where it was filed more than twenty days after the date of the decision but within twenty days after the date of a report of findings of fact made by the board upon request of one of the parties following the decision. [552]

The words "machinery used in manufacture" in G. L. (Ter. Ed.) c. 59, § 5, cl. 16, as amended, and the words "machinery employed in any

---

[1] Of the companion cases, fifteen are entitled Boston Gas Company *vs.* Assessors of Boston, and eight are entitled Assessors of Boston *vs.* Boston Gas Company.

branch of manufacture" in § 18, cl. 2, as amended, have the same meaning.  [554]

There was no merit in a contention by assessors attacking lists of property filed by a taxpayer that statements of value therein, although not required, must not differ substantially from opinions of value later given by the taxpayer's witnesses in proceedings before the Appellate Tax Board.  [555]

The truth, except as to valuation, of lists of property filed by a corporate taxpayer was concluded by G. L. (Ter. Ed.) c. 59, § 35, where, even if there was no evidence warranting findings by the Appellate Tax Board that the lists were accepted by the assessors without putting any officer of the taxpayer under oath as to the nature and amount of its property and that they were made and filed in good faith and were sufficient, there was no evidence to the contrary.  [554–555]

Compressors, governors, and consumers' meters of a gas company located in a city and forming an essential part of the whole system of the company for distribution to its customers in the city and elsewhere of gas manufactured or purchased and purified by it in another municipality; and substation equipment, overhead conductors, consumers' meters, line transformers, and transformer installations of the company located in the city and forming an essential part of the company's whole system for distribution to the customers of its electrical department in a certain district of the city of electricity entirely purchased by the company from an electric company which generated it, were, under G. L. (Ter. Ed.) c. 59, §§ 2 and 5, Sixteenth, as amended, taxable by the city as "machinery used in manufacture."  [564–565]

Statement by WILKINS, C.J., as to the valuation of property for local taxation.  [566]

On the issue of the valuation for taxation by a city of a portion of a gas company's distribution system located therein, there was no merit in a contention that deduction of Federal income taxes was improper in showing the earnings of the company, or in certain other specifications of error respecting earnings, or in a contention that the admission of evidence of book value and the company's allocation of depreciation reserve to be deducted therefrom was improper.  [571–573]

A determination by the Appellate Tax Board that a witness is qualified as an expert to give opinion testimony on issues before the board cannot be disturbed by this court on appeal from the board's decision if the determination is supported by evidence.  [573]

There was no merit in a contention that the reasons testified to by an expert witness for his opinion bear solely on the credibility of the opinion and are to be considered by the finder of facts only; such reasons are open to review to determine their legal competence as the foundation of the opinion.  [578–579]

An opinion by an expert witness does not constitute evidence if it appears that the opinion was founded wholly on legally incompetent reasons.  [579]

In a proceeding before the Appellate Tax Board involving the valuation for taxation by a city of property of a gas company located in the city

and forming an integral part, but only a part, of the entire system operated by the company throughout a much larger area, a certain hypothetical sale and lease back of the property in question used by an expert witness for the assessors and alleged by the company to be objectionable on various grounds did not appear to be the entire foundation of the assessors' evidence of value, as claimed by the company, rather than a mere check on the reliability of estimates of value arrived at by other methods, although influencing such estimates, and the admission of evidence relating to the sale and lease back for consideration by the board with all the other evidence bearing on the valuation did not furnish ground for disturbing the board's decision. [581–584]

There was no abuse of discretion on the part of the Appellate Tax Board, after completion of lengthy hearing of the issue of the valuation of certain property of a gas company, in denying a motion to reopen the hearing to receive evidence of recent estimates of certain costs of the company. [586]

APPEALS from decisions of the Appellate Tax Board.

*Edward B. Hanify & James S. Eastham,* (*Donald R. Grant & John A. Gage* with them,) for the taxpayer.

*Lewis H. Weinstein,* Special Assistant Corporation Counsel, (*William L. Baxter,* Corporation Counsel, & *Jerome Preston, Jr.,* with him,) for the assessors of Boston.

WILKINS, C.J.   Of these twenty-four appeals from decisions of the Appellate Tax Board, sixteen are by Boston Gas Company (formerly Boston Consolidated Gas Company) and eight are by the board of assessors of Boston. The controversies relate to the taxes paid upon personal property by the company for the years 1944 to 1951, inclusive.   The tax board granted a partial abatement of each tax but much less than the company sought.   For each year the gas company has two appeals and the assessors one. The reasons for the double appeals by the company are procedural.

Before the tax board the company's appeals for each of the eight years were consolidated and heard at length from January 22, 1952, until December 12, 1952.   On December 17, 1954, the tax board promulgated its decision, which was terse, comprised only mathematical conclusions, and, as now printed, covers less than two pages of the printed record in this court.   There also were brief findings made in passing

on the assessors' requests for rulings. The assessors filed a request for findings of fact and a report. G. L. (Ter. Ed.) c. 58A, § 13, as appearing in St. 1933, c. 321, § 7, as amended by St. 1953, c. 654, § 27. On April 22, 1955,[1] the tax board promulgated its findings of fact and report, which cover more than fifty pages of the printed record.

The company's first set of eight claims of appeal was filed with the tax board on January 4, 1955, and its second set, which reaffirms all the specifications of error appearing in the earlier claims of appeal, was filed on May 9, 1955. The assessors' claims of appeal were filed with the tax board on May 11, 1955. The company's first set of claims of appeal was filed because of a doubt as to the effect of G. L. (Ter. Ed.) c. 58A, § 13, as appearing in St. 1933, c. 321, § 7, and amended by St. 1953, c. 654, § 27, which provided that a "claim of appeal shall be filed with the clerk of the board within twenty days after the date of the decision of the board, or within twenty days after the date of a report of findings of fact, if such report is made on request of a party after the decision . . . ." We hold that the second set of claims of appeal was seasonably filed, as were the assessors' claims of appeals. The company's first set of appeals to this court is to be dismissed, and we shall consider the second set.

The company is a Massachusetts corporation created and existing by special acts. St. 1903, c. 417. St. 1905, c. 421. St. 1906, c. 422. St. 1926, c. 186. St. 1951, c. 446. During the years now material it engaged in the manufacture and purchase of gas at Everett, and the distribution of gas in Boston and nineteen other cities and towns, of which Everett is not one. The company also engaged in distributing electricity in the Charlestown district of Boston which it purchased from Boston Edison Company.

These cases do not concern real estate or intangible personal property, but involve those portions of the gas and electric distribution systems situated in Boston and taxable

---

[1] Minor amendments were made on May 4 and 6, 1955.

as personal property under G. L. (Ter. Ed.) c. 59, § 2 and § 5, Sixteenth, as appearing in St. 1941, c. 467.[1]  By G. L. (Ter. Ed.) c. 59, § 2, "All property, real and personal, situated within the commonwealth . . . unless expressly exempt, shall be subject to taxation."  Section 5, as amended, provides: "The following property . . . shall be exempt from taxation: . . . Sixteenth, Property, other than real estate, poles, underground conduits, wires and pipes, and other than machinery used in manufacture . . ., owned by . . . Massachusetts corporations subject to taxation under chapter sixty-three . . . ."  The company in the years now material was subject to tax under c. 63.  G. L. (Ter. Ed.) c. 63, § 53, as then amended.  See St. 1933, c. 254, § 60; St. 1934, c. 323, § 6; St. 1941, c. 509, § 7.

The company's property "exempt" under § 5, Sixteenth, is not exempt in the absolute sense, but is subject indirectly to taxation by inclusion in the valuation of its capital stock thus increasing the franchise tax payable to the Commonwealth.  For the years now material, see G. L. (Ter. Ed.) c. 63, § 55, as amended by St. 1936, c. 134, and St. 1939, c. 24, § 7.[2]  Eliminating the backhanded approach and paraphrasing the language of G. L. (Ter. Ed.) c. 59, §§ 2, 5, Sixteenth, real estate, "poles, underground conduits, wires and pipes," and machinery used in manufacture are taxable where situated.  Cases dealing with true exemptions, such as those of charities, which are relied upon by the assessors as resolving any doubt against the company, are not in point.  See *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston,* 294 Mass. 248, 257; *American Institute for Economic Research* v. *Assessors of Great Barrington,* 324 Mass. 509, 512.

---

[1] Subsequent amendments are immaterial.

[2] "The commissioner shall ascertain . . . the true market value of the shares of each corporation required to make a return under section fifty-three . . . and shall estimate therefrom the fair cash value of all the shares constituting its capital stock . . . which . . . shall, for the purposes of this chapter, be taken as the true value of its corporate franchise.  From such value there shall be made the following deductions: . . . Fifth.  In case of corporations subject to section fifty-three . . . the value as found by the commissioner of their works, structures, real estate, motor vehicles, trailers, machinery, poles, underground conduits, wires and pipes, subject to local taxation wherever situated."

The allusion to such a principle in *Collector of Taxes of Boston* v. *Cigarette Service Co. Inc.* 325 Mass. 162, 167, must be viewed as an inadvertence. See *Dudley* v. *Jamaica Pond Aqueduct Corp.* 100 Mass. 183, 184–185.

It will be convenient at this point to quote another statute, as to the effect of which there is dispute. General Laws (Ter. Ed.) c. 59, § 18, as amended by St. 1933, c. 254, § 30, provides: "All taxable personal estate within or without the commonwealth shall be assessed to the owner in the town where he is an inhabitant on January first, except as provided in chapter sixty-three and in the following clauses of this section: . . . Second [amended by St. 1936, c. 362, § 2], Machinery employed in any branch of manufacture . . . shall be assessed where such machinery . . . is situated . . . ."

The tax board granted the company's thirteenth request for a ruling: "The words 'machinery used in manufacture' as appearing in G. L. (Ter. Ed.) c. 59, § 5, cl. 16, as amended, and the words 'machinery employed in any branch of manufacture' as appearing in G. L. (Ter. Ed.) c. 59, § 18, cl. 2, as amended, have the same meaning." We think that this ruling was correct.

The tax board also granted the company's fifteenth request: "General Laws (Ter. Ed.) c. 59, § 18, as amended, is not effective to impose tax liability but is merely declaratory of which particular municipality has power to assess and collect taxes upon the types of property enumerated therein if they are otherwise taxable under other and different provisions of the General Laws." We need not now express an opinion as to the correctness of this ruling.

THE ASSESSORS' CONTENTION THAT THE COMPANY DID
    NOT FILE TRUE AND CORRECT LISTS OF ITS TAXABLE
    PROPERTY.

The tax board found that each list filed was accepted by the assessors without putting any officer of the company under oath as to the nature and amount of its property;

that at the time each list was filed the company believed it to be an accurate report of its property; and that each list was made and filed in good faith. "So far as it is a matter of fact, we find that each list was sufficient."

The assessors complain (1) that there was no evidence warranting these findings; and (2) that, while the company was not required to set forth valuations of the listed property, *Assessors of Quincy* v. *Boston Consolidated Gas Co.* 309 Mass. 60, 69–72, it could not set forth in its lists statements of fair cash value substantially different from the opinions of fair cash value later given by its witnesses. No authority is cited for this proposition, and we have been referred to nothing in the statute which requires such a result.[1] Indeed the statute says: "Assessors shall receive as true, except as to valuation, the list brought in by each person, unless, on being thereto required by the assessors, such person refuses to answer on oath all necessary inquiries as to the nature and amount of his property." G. L. (Ter. Ed.) c. 59, § 35. The statute seems conclusive, but even if there was no evidence warranting the findings, there was likewise no evidence from which it could have been found that any officer was questioned under oath or that the lists were filed in other than good faith.

## The Issues before the Appellate Tax Board.

At the hearing before the tax board, it was agreed that the following property was taxable: In the gas department, (1) yard piping at compressor and governor stations; (2) mains; (3) services (connections with consumers' premises); and (4) lamp services. In the electric department, (1) poles and fixtures; (2) underground conduits; (3) underground conductors; and (4) street lighting equipment. It was agreed that transportation and office equipment in Boston was not subject to local taxation.

The disputed items, which the company contends were not taxable and which the tax board held were taxable, are:

[1] In New York compare *People* v. *Cantor*, 198 App. Div. (N. Y.) 317, 318.

In the gas department, (1) compressors and governors; and (2) consumers' meters. In the electric department, (1) substation equipment; (2) overhead conductors; (3) consumers' meters; (4) line transformers; and (5) transformer installations.

There is the further broad question as to the fair cash valuation[1] of the personal property subject to taxation under c. 59, § 2 and § 5, Sixteenth, as amended. The accompanying table summarizes the tax board's findings as to the valuation of "Poles, underground conduits, wires and pipes, and machinery used in manufacture."

| Year. | Assessed Valuation. | Tax Assessed. | Fair Cash Value. | Over-valuation. | Tax Abated. |
|-------|--------------------|--------------|-----------------|-----------------|-------------|
| 1944 | $23,500,000 | $937,650 | $22,000,000 | $1,500,000 | $59,850 |
| 1945 | 26,000,000 | 1,105,000 | 22,000,000 | 4,000,000 | 170,000 |
| 1946 | 26,000,000 | 1,092,000 | 22,000,000 | 4,000,000 | 168,000 |
| 1947 | 26,000,000 | 1,209,000 | 22,000,000 | 4,000,000 | 186,000 |
| 1948 | 26,500,000 | 1,415,100 | 22,000,000 | 4,500,000 | 240,300 |
| 1949 | 26,500,000 | 1,505,200 | 22,000,000 | 4,500,000 | 255,600 |
| 1950 | 26,500,000 | 1,669,500 | 23,500,000 | 3,000,000 | 189,000 |
| 1951 | 26,500,000 | 1,664,200 | 24,000,000 | 2,500,000 | 157,000 |

FINDINGS OF THE TAX BOARD — THE GAS DEPARTMENT.

The company's principal business is to manufacture and purchase gas and distribute it through its distribution system to its customers. The source of the gas for the system is the company's plant in Everett. There it manufactures gas, and purifies all gas whether manufactured by it or purchased from the adjacent plant of Eastern Gas and Fuel Associates. Purified gas is there stored in three gas holders for transmission through mains. The main trunk line enters Boston through the Charlestown district, where one main belt line splits off and passes through Somerville and Cambridge and across the Charles River to a holder station in Allston. One other main belt line passes through

---

[1] General Laws (Ter. Ed.) c. 59, § 38, provides: "The assessors of each city and town shall . . . make a fair cash valuation of all the estate, real and personal, subject to taxation therein . . . ."

Boston to a holder station at Commercial Point in Dorchester. In the Allston district gas passes through holders and compressors into mains to serve the high pressure system in the areas north and west of Boston. The function of the compressors is to raise the gas pressure. At Commercial Point gas passes through holders and governors into mains to serve the area south and west of Boston, and through a system of mains, services, and meters is transmitted to all of Boston except the Hyde Park district. There is a gas holder station at Hilton Street, Boston, which is a controlling center for pumping out at Everett and for pressure in part of the system.

*Gas Meters, Station Governors, Compressors, and Engines.*

Gas stored in the three holders in Everett passes into pumps and compressors, which are driven by engines. By this process pressure is increased and gas is sent into the "intermediate pressure system," and thence through mains to other holders in and about Boston. The mains are generally in the street whence there are connections called services, which usually go into the premises of a customer to a meter. In Boston the company uses governors or regulators in addition to mains. A governor is a device for regulating the flow of gas. There are (1) district governors, which are parts of the main, and (2) plant or station governors. The governors, compressors, and engines in Boston "are essential parts of the system for the operation of the company's gas business."

The company uses two types of gas meters. These in and of themselves neither make nor manufacture anything. Their purpose is to measure the amount of gas passing through the meter. In Everett there are meters which measure gas leaving the storage holders, the totals of which when read with the total readings of the meters of all consumers enable the company to determine the amount of unaccounted for gas in the system.

The gas mains, services, gas meters, station governors,

compressors, and engines, and the yard piping at the compressor and governor stations, constitute the whole system for the transmission of gas, and without them the company would not be able to operate its gas business in the manner in which it has. "In so far as it is a question of fact," the gas meters, station governors, compressors, and engines, situated in Boston, constituted machinery used in manufacture and were subject to local taxation. The tax board quoted at length from *Commonwealth* v. *Lowell Gas Light Co.* 12 Allen, 75, 78–79.

FINDINGS OF THE TAX BOARD — THE ELECTRIC DEPARTMENT.

*Substation Equipment, Line Transformers, and Transformer Installations.*

The company's transformer station and substation equipment includes transformers, switching equipment, laboratory equipment, and miscellaneous instruments such as watt meters, volt meters, and ammeters. Line transformers are located in the streets or on poles. Transformer installations consist "of the equipment which has to do with the installation of transformers."

Transformers are used in the electric distribution system. The company purchases electrical energy from Boston Edison Company at 13,800 volts. The "energy from this 13,800 volt system is lowered through transformers to a 2,400 volt system at two points in Boston."[1] From these

---

[1] The statement that the energy was lowered is in error. Doubtless the intended reference is to voltage. The actual testimony came from Machen, the company's electric department head, and was: "The Boston Consolidated Gas Company purchases its electrical energy requirements for its Charlestown electrical division from the Boston Edison Company at 13,800 volts. Then the company transfers energy from this 13,800 volt system to a 2,400 volt system at two points in the city of Boston. From these two points the energy is distributed throughout the area at 2,400 volts through a system of feed lines called primary feeders. Then at many locations throughout the area, as customers' load requires, transformers are installed to transfer energy from this primary system to a lower voltage secondary system which the customers' appliances require." Machen also testified that a transformer is "certainly not designed for the purpose of reducing the amount of energy passing through the line"; and that "Energy is a capacity to perform work."

two points the energy is distributed at 2,400 volts through a system of feed lines called primary feeders. At many locations transformers reduce the voltage to that which the customers' appliances require. All the transformers work on the same principle. The basic design is a rectangular frame of iron with a connecting iron leg or strip running from the center of the bottom to the center of the top of the frame. Around the center strip are successively wound two coils each with a desired number of turns. The number of turns in each coil has a bearing on the characteristics of the transformer.

The transformers are used to "transfer" energy from one part of the system to another part of the system, such as from a primary system to a secondary system. In the transformers the coil connected with the 2,400 volt primary system has twenty times as many turns as the coil connected with the secondary system. With this ratio of turns, twenty to one, any energy put into the transformer at 2,400 volts will come out as energy at 120 volts. This result is brought about by the action of a magnetic field through the iron core on which the coils are wound. Transformers are used in the distribution system as a matter of economy, and enable the company to dispense with the very expensive equipment which would otherwise be necessary in order to distribute the large quantities of power required by its customers at the lowest voltage at which they use it. The normal voltage used "for house and home appliances" is 120 volts. As a practical matter of safety and convenience, it would be difficult for customers to provide means to utilize 2,400 volt power for the many home appliances in use today.

None of the transformers in the company's distribution system generates any electrical energy. The transformer ceases to function whenever the lines feeding it are cut off. There are no moving parts. Their input as well as output is electrical energy. A slight loss of energy in leaving the transformer is manifested in the form of heat.

None of the company's customers owns equipment which

can be used at 13,800 voltage. Of approximately 7,000 electrical customers, about five[1] use 2,400 volts for industrial or commercial purposes, and the others are residential customers, and must use a voltage varying from 110 to about 240. The company's transformers are "a necessary and integral part of its transmission system in order to serve its customers in the conduct of its business as an electric company."

### Electric Meters.

The company's electric meters are used to measure the quantity of electrical energy passing at a given point. None of the meters generates electrical energy. Their input and output are electrical energy. Electric meters are usually located on customers' premises. Prior to the development of meters, electricity was sold on the basis of the number of lights in the house. At the time of the hearing before the tax board electricity for street lighting was sold without meters. In almost every other case the meter determines the amount of the bill a customer is to receive. In addition to measuring the amount of electrical energy which consumers use, the meters permit the company to determine the amount of electrical energy unaccounted for from the time of purchase from the Edison Company.

Meters and transformers constitute a part of the whole electrical distribution system and without them the company would not be able to operate its electrical business in the manner in which it has. "In so far as it is a question of fact," the transformers, substation equipment, and transformer installations, together with the electric meters, constituted machinery used in manufacture and were subject to local taxation.

"In the opinion of the board and on the facts as found, the company's transformers, substation equipment and transformer installations, as used by the company, take an elec-

---

[1] This is an obvious error for five per cent. The testimony, which was by Machen, shows that it was "a small percentage . . . five would cover it"; and that the number was 300 to 350.

trical energy which is unsuitable for use by the consumers of the company and change it into electrical energy suitable for use, so that these particular property items, together with the electric meters, which are an integral part of its electric distribution system, constitute machinery used in manufacture, within the meaning of" G. L. (Ter. Ed.) c. 59, § 5, Sixteenth, as appearing in St. 1941, c. 467, and G. L. (Ter. Ed.) c. 59, § 18, Second, as amended by St. 1936, c. 362, § 2.

## *Overhead Wires.*

The company contended that its overhead wires were not locally taxable, and that under G. L. (Ter. Ed.) c. 59, § 5, Sixteenth, as amended, "underground conduits, wires and pipes" must be construed as referring only to underground wires. The tax board rejected the contention. Because of the result we reach we omit unnecessary discussion of this point.

## THE SPECIFICATIONS OF ERROR.

The company filed ninety-five specifications of error, some with as many as seven subdivisions, covering twenty-six pages of the printed record. The assessors filed forty-three specifications of error, which cover ten pages of the record, and some of which are to numerous rulings on many pages of the transcript.[1]

With literally hundreds of alleged errors raised by both parties, who have not expressly waived any of them, reasonable treatment in an appellate opinion must be on broad grounds.

---

[1] For example, the assessors' specifications numbered 1, 9, 12, 20, 22, 23, and 24, respectively, are to rulings on evidence on seventeen, forty-one, thirty-four, seventy-one, nine, twenty-four, and twenty-seven pages of the transcript; specification numbered 27 is to the denial of one hundred thirty-one requests for rulings; and specification numbered 29 is to the granting of ninety-eight requests for rulings. The company filed one hundred fifty requests for rulings and the assessors one hundred eighty-three. Each filed specifications of error to the granting of opponent's requests and to the refusal of its own.

QUESTIONS OF LAW RELATING TO SPECIFIC CATEGORIES OF PERSONAL PROPERTY IN BOTH DEPARTMENTS.

The personal property, taxability of which is in dispute, falls into two classes: (1) Categories which the tax board held to be "machinery used in manufacture." In this class are gas meters, engines, compressors, and station governors, and electric meters and transformers. (2) Overhead electric wires, which the tax board held were not excluded from local taxation as "Property, other than real estate, poles, underground conduits, wires and pipes."

MACHINERY USED IN MANUFACTURE — GAS DEPARTMENT.

The quotation from *Commonwealth* v. *Lowell Gas Light Co.* 12 Allen, 75, 78–79, makes it evident that the tax board was ruling that the entire gas equipment of the company in Boston was part of "one great integral machine" originating in Everett, where the company manufactured or bought and purified its gas. The *Lowell Gas* case was an action to recover the amount of an excise tax assessed upon a gas light corporation for the year 1864 under St. 1864, c. 208. The tax was measured by "the excess of the market value of all the capital stock . . . over the value of its real estate and machinery" taxed locally (§§ 5, 1, 15). In 1864 the gas light corporation was taxed in Lowell on all its property valued at $240,000. The Commonwealth determined the value of the defendant's capital stock at $240,000, deducted the value of real estate and machinery for making gas, leaving a balance upon which it was sought to base the tax and which was the value of the "mains and pipes used for distributing gas, laid in the streets and ways of Lowell, and the mains leading from the works to the gasometers, together with the meters in the places where the gas is taken" (page 75). The court ruled that the deduction was improper and decided for the defendant, saying at pages 78–79 in an opinion by Chief Justice Bigelow: "The remaining question is, whether the commissioners appointed

to ascertain and fix the value of the aggregate of the shares or capital stock, and to deduct therefrom the value of the real estate and machinery belonging to the corporation, have properly omitted to include within the latter the value of the mains and pipes used for distributing gas throughout the city in the various streets, lanes and by-ways, and also the value of the mains leading from the place where the gas is made to the large gas-holders, together with the value of the meters through which the gas passes in each place where it is consumed, in order to measure the quantity there used. On this question, it seems to us that there is no room for serious doubt. The corporation is established, in the words of the act creating it, 'for the purpose of manufacturing and disposing of gas in the city of Lowell.' The mains or pipes laid down in the streets and elsewhere to distribute the gas among those who are to consume it were clearly a part of the apparatus necessary to be used by the corporation in order to accomplish the object for which it was established. They constituted a part of the machinery by means of which the corporate business was carried on, in the same manner as pipes attached to a pump or fire-engine for the distribution of water, or wheels in a mill which communicate motion to looms and spindles, or the pipes attached to a steam-engine to convey and distribute heat and steam for manufacturing purposes, make a portion of the machinery of the mill in which they are used. Indeed, in a broad, comprehensive and legitimate sense, the entire apparatus by which gas is manufactured and distributed for consumption throughout a city or town constitutes one great integral machine, consisting of retorts, station-meters, gas-holders, street-mains, service-pipes and consumers' meters, all connected and operating together, by means of which the initial, intermediate and final processes are carried on, from its generation in the retort to its delivery for the use of the consumers. No satisfactory reason has been suggested by the attorney general for excluding any part of the value of this apparatus from the deduction which the tax commissioners are required to make for the machinery of the

corporation properly taxable in the city where it is estab-
lished, and we have been unable to see any plausible ground
for refusing to make such deduction."

The phrase "machinery of the corporation properly tax-
able in the city," referred to in the last sentence of the quo-
tation, includes the mains, pipes, and meters outlined in the
first sentence of the quotation. It is true that St. 1864,
c. 208, required the deduction of the value of "real estate
and machinery" taxed locally, and that in it the word
"manufacture" did not appear. But Gen. Sts. c. 11, § 12,[1]
provided, "All personal estate within or without this state,
shall be assessed to the owner in the city or town where he
is an inhabitant . . . except as follows: . . . Second. All
machinery employed in any branch of manufactures, and
belonging to a person or corporation, shall be assessed where
such machinery is situated or employed; and, in assessing
the stockholders for their shares in any manufacturing cor-
poration, there shall first be deducted from the value
thereof, the value of the machinery and real estate belong-
ing to such corporation." See *Boston & Sandwich Glass Co.*
v. *Boston*, 4 Met. 181, 183; *Murray* v. *Berkshire Life Ins.
Co.* 104 Mass. 586, 587; *Boston Investment Co.* v. *Boston*,
158 Mass. 461, 462. The statute last quoted was a pred-
ecessor of G. L. (Ter. Ed.) c. 59, § 18, Second. The field
for operation of § 18, Second, is restricted to such property
as is not within the so called exemption of § 5, Sixteenth.
*New England Mutual Life Ins. Co.* v. *Boston*, 321 Mass. 683,
689. *Assessors of Brockton* v. *Brockton Olympia Realty Co.*
322 Mass. 351, 355. It seems to us that the *Lowell Gas*
case is a square holding that the mains, pipes, and meters
were "machinery employed in any branch of manufacture."
Otherwise, it would not have been, to quote the words of
Chief Justice Bigelow, "machinery of the corporation prop-

---

[1] The tax board granted the company's request: "14. General Statutes,
c. 11, § 12, cl. 2, was not effective to impose tax liability but was merely
declaratory of which particular municipality had power to assess and collect
taxes upon the types of property enumerated therein if they were otherwise
taxable under other and different provisions of the General Statutes." This
corresponds to request numbered 15 and the action thereon hereinbefore
mentioned.

erly taxable in the city where it is established" (page 79). And as we have already said, we are of opinion that the phrase "machinery employed in any branch of manufacture" is synonymous with "machinery used in manufacture," to be found in c. 59, § 5, Sixteenth.

To us in 1956, this may seem like a curious type of machine, and as an original proposition we might have difficulty in conceiving of consumers' meters, for example, as part of such a machine or as machinery used in manufacture.[1] The *Lowell Gas* decision has, however, stood for ninety years unaffected by legislation. We feel constrained to follow it, and to hold that the disputed items in the gas department were subject to tax in Boston.

### MACHINERY USED IN MANUFACTURE — ELECTRIC DEPARTMENT.

Our conclusion as to the gas department would make it incongruous to reach a different result as to the electric department. While the company buys all its electricity and manufactures none, its equipment is nevertheless connected with similar equipment of the Boston Edison Company. The personal property of the latter company which is in a system with its own generating plant is machinery used in manufacture, and logic would be lacking for failing to hold the personal property in the electric department of the gas company to be likewise. There is no requirement that "one great integral machine" be exclusively owned by a single company any more than that it be contained within the boundaries of a single municipality.

It, therefore, becomes unnecessary to discuss separately the disputed items of personal property.

---

[1] In *Assessors of Quincy* v. *Boston Consolidated Gas Co.* 309 Mass. 60, it was said at page 61, "The taxable personal property in Quincy on January 1, 1935, consisted principally of street mains, service connections and customers' meters." It appears, however, that the company filed lists of such property (page 61), and that the dispute "centered" upon fair cash value (page 62).

## Fair Cash Value.

The tax board granted requests for rulings made by the parties on the issue of fair cash value. Although these requests were substantially to the same effect, each party specified error as to the granting of most of those requested by the other. The principles, however, are familiar, and we have discovered no error in these rulings, some of which we condense in order to present the cases in proper perspective. The standard of valuation of property subject to local taxation is fair cash value. This means fair market value, which is the price an owner willing but not under compulsion to sell ought to receive from one willing but not under compulsion to buy. It means the highest price that a normal purchaser not under peculiar compulsion will pay at the time, and cannot exceed the sum which the owner after reasonable effort could obtain for his property. A valuation limited to what the property is worth to the purchaser is not market value. Nor is the value of the company's property to it or to the owners of its capital stock to be included. The fair cash value is the value the property would have had on January 1 of any taxable year in the hands of any owner, including the present owner. In determining fair cash value, the value of such property for any special purpose together with its value for all purposes for which it is reasonably adapted may be shown. *National Bank of Commerce* v. *New Bedford*, 175 Mass. 257, 262. *Massachusetts General Hospital* v. *Belmont*, 233 Mass. 190, 195, 206, 209. *Maher* v. *Commonwealth*, 291 Mass. 343, 348. *Assessors of Quincy* v. *Boston Consolidated Gas Co.* 309 Mass. 60, 63–64. *Commissioner of Corporations & Taxation* v. *Boston Edison Co.* 310 Mass. 674, 688–691. *Epstein* v. *Boston Housing Authority*, 317 Mass. 297, 299. *Tigar* v. *Mystic River Bridge Authority*, 329 Mass. 514, 517–518.

The framework of the company's case on this issue is stated in its brief to be in accordance with a statement in *Assessors of Quincy* v. *Boston Consolidated Gas Co.* 309 Mass.

60, 66–67: "Original cost with deductions, if any, for depreciation, replacement cost and productive power are all legitimate elements bearing upon true value, but no one of them is decisive." This statement is also to be found in *Essex Co.* v. *Lawrence,* 214 Mass. 79, 89. To the extent permitted by the tax board, the company introduced evidence (1) of the capitalized value of the reasonably prospective net earnings of the taxable property available for interest and dividends, (2) of reproduction cost new less depreciation, (3) of actual original cost estimated by an expert, and (4) of book value less depreciation as that net book value related both to actual original cost and to the rate base appropriate for rate making. We read in the company's brief that its position before the tax board was that "the reasonably prospective net earnings of the taxable property available for interest and dividends constituted the primary criterion of the fair cash value of that property"; and that "the fair cash values of the property admitted by it to be taxable lay within the area between the fair cash value opinions of its two expert witnesses" on that question, who were Cunningham, its secretary and treasurer, and Gilman, an engineer. Cunningham's figures ranged from $9,600,000 in 1944 to $10,000,000 in 1951. Gilman's totals included a low figure of $10,712,100 in 1944 and a high figure of $13,982,300 in 1951.

Cunningham, in reaching his opinion as to the fair cash value of the property, considered sales of similar property as part of a going gas business, the value of the business from the standpoint of an investor, and the reasonably prospective net earning power capitalized. He compared the values obtained by such capitalization with the fair value of the property for the purposes of rate making, which he called the rate base value. In his opinion the rate base value would place a ceiling on what an investor would pay, and reproduction cost less depreciation, being higher, should be discarded. He also considered the age of the property, accrued depreciation on an age life basis, original cost, and net book value.

As shown on its books, the company's total net earnings, after Federal taxes, available for interest and dividends were as follows:

| Year. | | | | | Gas. | Electric. | Total. |
|---|---|---|---|---|---|---|---|
| 1944 | . | . | . | . | $1,766,316 | $108,493 | $1,874,809 |
| 1945 | . | . | . | . | 1,571,190 | 122,534 | 1,693,724 |
| 1946 | . | . | . | . | 1,257,088 | 126,574 | 1,383,662 |
| 1947 | . | . | . | . | 857,214 | 117,895 | 975,109 |
| 1948 | . | . | . | . | 378,885 | 92,683 | 471,568 |
| 1949 | . | . | . | . | 931,657 | 87,169 | 1,018,826 |
| 1950 | . | . | . | . | 1,213,366 | 99,238 | 1,312,604 |
| 1951 | . | . | . | . | 1,198,153 | 86,756 | 1,284,909 |

In order to determine net earnings for the Boston property, Cunningham adopted one of two methods of allocation of gas department earnings:[1] (1) the detailed method, which involves an analysis of each account[2] of income and expense, (2) the overall method, which involves the allocation of the entire net earnings on one or all of certain bases.

The witness Cunningham preferred the detailed method. He examined each account of income and expense for the years 1943 to 1950, inclusive. The actual amount in any category of income or expense for Boston, if known, was used. If not, an allocation was made to Boston of the total expenses for the company in the particular account in accordance with the percentage or ratio which the witness believed appropriate. The bases of allocation included (1) the ratio of the number of gas meters in Boston to the total number in the entire company; (2) the ratio of the thousands of cubic feet of gas sendout to Boston to the thousands of cubic feet of gas sendout to the company as a whole; (3) the ratio of dollar sales in Boston to dollar sales in the entire company (excluding sales to other companies and street lights); (4) the ratio of average actual expenses in Boston to those of the whole company; and (5) the ratio

---

[1] None was necessary for electric department earnings, as they were all attributable to Boston.

[2] Segregated on company's books in accordance with the classification of accounts required by the department of public utilities.

of the book value of the property in Boston to that of the property of the entire company. The company in its brief states that this was the method used by the witness Cunningham in *Assessors of Quincy* v. *Boston Consolidated Gas Co.* 309 Mass. 60, 62.

The overall method of allocation of earnings was presented by the witness Gilman. For each year he allocated to Boston 60% of the figure which in his opinion was the reasonably prospective gas department net earnings of the entire company available for interest and dividends in that year. In deciding that 60% was a reasonable ratio to apply, he computed for each year the ratios of book value of gas property, gas gross revenues, and gas meters in Boston to the respective totals for the company as a whole. His judgment was based on his experience in making similar allocations for public utility systems. .

Three witnesses called by the company testified as to the rates at which earnings should be capitalized: Cunningham, whose high was 7% in 1944 and low was 6% in 1946, 1947, and 1951; Gilman, whose high for gas was 7% in 1944 and low was 5.75% in 1951, and whose rate for electric earnings was 6% for each of the years in question; and Richardson, an officer of a Boston investment company, who began with 7.40% in 1944, reached his low at 6% in 1946 and his high at 7.75% in 1949, concluding with 6.65% in 1951.

After making allocations of income and expense, Cunningham computed what he considered to be the net earnings of the gas business in Boston to which he added the actual figures for the electric department net earnings. Capitalizing the total net earnings at the rate he deemed proper, he established what he considered to be the value of all the property both taxable and listed as nontaxable. He then made deductions for real estate at assessed value, net cash assets or working capital, the tangible personal property listed as nontaxable, and going concern value. The result was a valuation of the property listed as taxable on the basis of a capitalization of net earnings.

In 1949, 1950, and 1951 the company was trying to obtain natural gas, the use of which would tend to decrease operating expenses. Cunningham was of the opinion that in the years 1950 and 1951 the expectancy of the advent of natural gas would tend to increase the value of the company's property in the minds of prospective buyers of gas property.[1]

Gilman's method of arriving at what he considered fair cash value was basically as follows: (1) determine the reasonably prospective gas net earnings of the entire company available for interest and dividends; (2) allocate a proper share of those gas net earnings to Boston; (3) capitalize those earnings at a rate he deemed proper; (4) determine the reasonably prospective electric net earnings available for interest and dividends; (5) capitalize those earnings at a rate he deemed proper; (6) add the capitalized values of the gas net earnings allocated to Boston and of the electric net earnings; (7) add the capitalized value of the estimated net tax savings which would have resulted if the Boston property had been assessed at what he considered to be its fair cash value, in order to arrive at the fair cash value of all the property in Boston; and (8) deduct working capital, the assessed value of real estate in Boston, and the value of the personal property claimed to be nontaxable in Boston.

The book value of the entire depreciable property ranged from $48,251,387 in 1944 to $53,820,221 in 1951. The undepreciated book value of the Boston property was: in 1944, the lowest year (property listed by the company as taxable) $17,992,445, (property listed as nontaxable) $3,017,045; in 1951, the highest year (listed as taxable) $18,796,830, (listed as nontaxable) $3,636,637.

The company's evidence of reproduction costs new less depreciation of the property admitted to be taxable was given by Forstall, an engineer. His estimates began in 1944 with $28,970,874 (reproduction cost new), $15,498,610 (depreciation), and $13,472,264 (reproduction cost new less de-

---

[1] We are told in the company's brief that it was unable to deliver natural gas in Boston until September 9, 1953.

preciation) and closed in 1951 with the respective figures of $54,233,516, $32,542,130, and $21,691,386.

Forstall gave testimony as to reproduction cost new of the property listed as nontaxable for the years 1944 and 1949.

SPECIFICATIONS OF ERROR ARGUED BY THE ASSESSORS.

The assessors contend that the tax board committed error of law in admitting the company's evidence of earnings, its allocation of earnings to Boston, the deduction of Federal income taxes therefrom, the capitalization of such reduced allocated earnings, the deductions therefrom, and the opinions of fair cash value based thereon, and in various related rulings.

*The Dèduction of Federal Income Taxes.*

The basis of the contention as to the deduction of Federal income taxes is that value of the property would vary from owner to owner according to income tax status and total income from all sources; and would vary from year to year with changes in the tax statutes. Other circumstances, unrelated intrinsically to the property, which the assessors say would cause a variation in the earnings to be capitalized, arise from the status of the owner, who might be an individual, a partnership, a business corporation, or charitable corporation. To permit the deduction, it is argued, would destroy uniformity of taxation upon the same kinds of property, and would be violative of the principle, recognized in the granting of requests for rulings, that fair cash value be the same in the hands of any owner, including the present owner.

We do not agree. A purchaser of this property, which is suitable chiefly only for its present use, undoubtedly would be realistic, and would not regard its true earning capacity as a gross amount apart from the highly important subject of Federal income taxes, even though the taxes were those of the present owner only. In *Assessors of Quincy* v. *Boston Consolidated Gas Co.* 309 Mass. 60, the original papers dis-

close that the company made a deduction for Federal income taxes. It is true, as the assessors here point out, that the question was not there made the subject of argument. But it does not follow that the result should have been otherwise. At page 67, it was said, "The [tax] board properly took into account the financial returns that had been realized from the use of the property. It could be found to be one of the controlling inducements in settling a fair price for the purposes of sale. We cannot say there was error in ascertaining the earning capacity of this underground system for the distribution and sale of gas and capitalizing the earnings at the proper rate, and in weighing, checking and balancing the result so obtained with the other valuations appearing in the testimony." This statement is in no real sense a departure from the principle that fair cash value is the same in the hands of any owner, including the present owner. To allow this evidence to be submitted to the selective judgment of the tax board along with other elements of value is merely a recognition of another principle also stated in the *Quincy* case, at page 66: "The market value of this kind of property must be ascertained from a consideration of all the factors that ought to influence the judgment of a seller and a buyer in reaching a fair price. The capacity of the distributing system to operate at a profit would be a matter of importance to those who ordinarily invest in such enterprises." Weight could also be given to the not altogether unreasonable possibility that a theoretical purchaser would be a corporation similar to this company.

*Miscellaneous Other Contentions of the Assessors.*

Other contentions of the assessors may be briefly disposed of. The tax board did not err in denying the assessors' request numbered 182 to the effect that the company had failed to sustain the burden of proof. The assessors, who had resorted to an extremely complicated proof of fair cash value through their expert Hill, urge (1) that the

company did not show that it was impossible to prove the value of its property without dispensing with the general rule that earning capacity rather than earnings is the measure of determining such value; and (2) that the company's evidence did not point out earnings of the specific property the taxability of which is in issue, in other words, that portion of the company's system lying within the geographical limits of Boston. We cannot say that the tax board was in error in either respect.

Nor did the tax board commit error of law prejudicial to the assessors in admitting the company's evidence of book value and its allocation of depreciation reserve to be deducted therefrom. See *Stein* v. *Strathmore Worsted Mills*, 221 Mass. 86, 90. Other contentions, briefly presented, have been considered and do not call for discussion.

### SPECIFICATIONS OF ERROR ARGUED BY THE COMPANY.

#### *Qualifications of Hill.*

With respect to the assessors' case the company's contentions arise chiefly from evidence given by the assessors' expert Hill. The first point, namely, that Hill was not testimonially qualified to express opinions of the fair cash values of any of the property in the gas department, we do not accept. Following the analogy of the courts, it was for the tax board to determine the qualifications of the witness, and its conclusion, being one of fact, can be disturbed only where there is no evidence to warrant that conclusion. *Commonwealth* v. *Bellino*, 320 Mass. 635, 637–638. *Amory* v. *Commonwealth*, 321 Mass. 240, 259. *Arena* v. *John P. Squire Co.* 321 Mass. 423, 425. *Mazukna* v. *Powers*, 333 Mass. 331, 335. There was such evidence. The tax board in its decision described the witness as "a consulting engineer, with many years of experience in the field of public utilities." While, as the company indicates, most of this was in the domain of electric or telephone companies, it was not altogether so. We need not elaborate discussion.

For a similar reason we cannot say that the tax board was in error in refusing to rule that Hill also lacked the qualifications to express an opinion as to the amounts of depreciation to be deducted from the replacement costs new of certain property in the gas and electric departments. It was not indispensable that a witness with Hill's qualifications actually observe all the property. *Miller* v. *Smith*, 112 Mass. 470, 475. *Ross* v. *Schrieves*, 199 Mass. 401, 402. *New York Central Railroad* v. *Freedman*, 240 Mass. 200, 210. "A witness's training and experience may well qualify him to give an opinion in reference to a problem which he has never before encountered in precisely the same form. *Hardiman* v. *Brown*, 162 Mass. 585." *Commonwealth* v. *Bellino*, 320 Mass. 635, 638. There was no error in the denial of the company's requests numbered 40 to 47, inclusive.

## The Sale and Lease Back.

The principal objection to Hill's testimony is to a hypothetical sale and lease back of that portion of the gas department in Boston and of the electric department. As the parties do not agree as to the purpose and effect of that testimony we must outline the matter in some detail. We shall first summarize some of the statements made in the tax board's decision. Hill accepted Forstall's figures of reproduction cost new of the property listed as taxable by the company. For property listed as nontaxable, he used Forstall's figures of reproduction cost new for the years 1944 and 1949 with interpolations on a straight line basis (whereby the percentage of depreciation is found by dividing the age of the property by its estimated life expectancy) for the intervening four years and for 1950 and 1951. In cooperation with an associate, Kushing, in order to determine the life expectancy of the surviving plant on a mortality and actuarial basis, Hill made studies by years of the company's property records and reports, which included additions, retirements, and balances of property remaining in service. He also inspected some of the physical plant. By

the "simulated plant balance method," previously developed by him, he checked "the mortality experience" of the company against its actual records of gross additions and retirements in order to show for each installation of property the percentage of the initial installation which survived each year. He used this method because the depreciation of certain mass properties, like mains or meters, could not be observed. Having determined the simulated plant balance of the mass properties, Hill applied a 6% compound interest sinking fund method of depreciation in order to ascertain the accrued depreciation of surviving plant additions. His estimates appear in a later footnote. They began in 1944 with (a) gas department $30,140,954 (reproduction cost), $2,361,434 (depreciation), and $27,779,520 (reproduction cost less depreciation), (b) electric department $1,542,020, $321,628, and $1,220,392, respectively, and ended in 1951 with (a) gas department $56,122,015, $5,231,503, and $50,890,512, respectively, and (b) electric department $3,158,983, $797,448, and $2,361,535, respectively.

Hill had formed an opinion of the fair cash value of the gas and electric property for each of the material years. He considered book cost, the depreciation reserve, income and expenses taken from the company's books, location of the property, regulation by the department of public utilities, and, in the gas department, competition with other fuels and the use of the property to serve Boston and areas outside. Hill's opinion of fair cash value "was also based upon his consideration of the earning capacity of the gas and electric property."

His theory was that the fair cash value was equivalent to reproduction cost new less depreciation if the earnings derived from the property were adequate to support a purchase and sale at reproduction cost new less depreciation; and if not, reproduction cost new less depreciation was leveled down to the point where the earning capacity could, in his opinion, support such a purchase and sale.

Hill's opinion of fair cash value "was also based on a

hypothetical sale and lease back of the company's property at a rental which, in his opinion, was sufficient to support the purchase money investment." His opinion of the fair cash value of all the property involved in these appeals ranged from Jnauary 1, 1944, $27,800,000 (gas), $1,220,-000 (electric), and $29,020,000 (total) to January 1, 1951, $35,000,000 (gas), $2,000,000 (electric), and $37,000,000 (total).

"In order to test the fair cash value of the company's gas property in Boston for the year 1944 and also for a twelve month period from November 1, 1952, to October 31, 1953, a pro forma year," the assessors introduced in evidence an exhibit prepared by Hill marked "X," which is much too long to set forth here in tabular form. The exhibit covered (1) the year 1944 and (2) a twelve month period in 1952–1953, or pro forma year, after the assumed advent of natural gas.

The method used by Hill in exhibit X as to the year 1944 follows. He took from the company records $1,766,315 (total revenue of entire company less total expenses for entire company), so called gross income, and from the company's report to the department of public utilities $1,295,855, income from common stock applicable to the gas department. Next he made an allocation to the gas department of $10,700,530, representing that part of the company's total bonds and notes in the proportion that the gas department interest on notes bore to the company's total interest on notes. To this he added $34,554,893 (common stock, premium on capital stock, and total corporate surplus), and arrived at a total of $45,255,423. This gave 3.90% reported return on total capital and 3.75% reported earnings on common stock. He then took book cost of personal property contended to be taxable, $19,348,422, and by allocating a depreciation reserve of his own reduced it to $16,854,410. He thereafter assumed a sale price of $30,000,000 and a rental of 6%. Next he applied a composite depreciation rate on the item of book cost and achieved a reduction in depreciation of $363,170, which with an esti-

mated reduction in Federal income tax of $612,895, left a net increase in expenses including Federal tax of $823,935. Subtracting the last figure from the original gross income figure of $1,766,315 gave as gross income after sale $942,380. He also computed income available for common stock as $516,920. The difference between the assumed sale price of $30,000,000 and the allocation of depreciation reserve, shown above as $16,854,410, is $13,145,590, which Hill termed profit on sale, on which a capital gains tax of 25% would be $3,286,398. The net proceeds of the sale ($30,-000,000 less the gains tax) would be $26,713,602. Of this Hill used $1,500,000 to retire bonds and $25,200,000 to retire stock, all of which was owned by Eastern Gas and Fuel Associates, a large industrial and commercial system. Deducting the last figure from common stock equity ($34,554,-893) would leave a balance of common stock equity of $9,354,893, on which the return would be 5.53%. Deducting the amounts used to retire bonds and stock from the original total of $45,255,423 would leave a total capital remaining of $18,555,423, on which the return would be 5.08%.

Hill "used the same technique and mode of computation" for the years 1945 to 1952, inclusive, assuming gradually higher sale figures, which in 1951 and 1952–1953 reached $35,000,000.

The items appearing in exhibit X for the pro forma year 1952–1953 were employed "to test the earning potential of natural gas in the first year of natural gas operation, on the assumption that the company would convert its facilities to natural gas during this period." Hill assumed that the gross revenue for this period would amount to $2,674,000, and that the annual expense for amortization for conversion to natural gas would be $120,000, leaving a gross after amortization of $2,554,000. These figures were supplied by Kushing, who derived them from his studies of the company's projected sales as reported by it to the Federal power commission and from his own estimates of prospective gas

use by the company's customers. He assumed that there would be no change in rates; that the company would pay 53 cents a thousand cubic feet for natural gas and 48.92 cents for manufactured gas; and that the company would use 70% natural gas and 30% manufactured gas for the pro forma year. In his opinion, the highest and best use of the property would be for the distribution of 100% natural gas. Based upon the estimated revenues and expenses shown in exhibit X, which we do not take the space to set forth, in a manner similar to that used by him for 1944 Hill gave his opinion that "a hypothetical purchaser-lessor" would be willing to pay $35,000,000 for the property in 1952–1953, and reached the conclusion that the return on total capital would be 11.97% and return on capital stock would be 19.61%.

Before discussing the merits, we must dispose of a preliminary contention of the assessors to the effect that the reasons assigned by an expert for his opinion are not evidence of value but are admissible only to enable the tribunal of fact to appraise credibility, and hence that Hill's final opinion of fair cash value was his only evidence of value. These are not correct statements. In a case cited by the assessors, *Perangelo's Case*, 277 Mass. 59, 64, it was held that evidence of prior inconsistent opinions as to the cause of an injury which medical experts had once entertained but at the time of the trial had abandoned did not create substantive evidence of their former opinions. An expert opinion is admissible without the reasons therefor. *Commonwealth* v. *Johnson*, 188 Mass. 382, 388–389. *Greene* v. *Cronin*, 314 Mass. 336, 342–343. Yet it is error to exclude those reasons, *Hawkins* v. *Fall River*, 119 Mass. 94, at least where "otherwise unobjectionable." *Dwight* v. *County Commissioners of Hampden*, 11 Cush. 201, 204. But where it appears that an expert presently relies upon a reason which is speculative or unsound, an exception may lie. There are cases rejecting an expert opinion based upon uncertain or improper factors. *Wesson* v. *Washburn Iron Co.* 13 Allen, 95, 100. *Harney* v. *Shaw*, 141 Mass. 340, 341–342.

*Haven* v. *County Commissioners of Essex,* 155 Mass. 467, 471–472. 20 Am. Jur., Evidence, § 795. In *Greenspan* v. *County of Norfolk,* 264 Mass. 9, 12–13, it was held that an opinion of an expert as to value should have been struck out when cross-examination developed that it was based upon an improper legal standard. In *Maher* v. *Commonwealth,* 291 Mass. 343, 348–349, where the witness was not an expert but the owner, the *Greenspan* case was cited as authority for the statement that "the testimony as to value given by this witness was based upon erroneous foundations and ought to have been excluded." We perceive no justification for holding that an expert's reasons are not evidence whenever he testifies that he considered speculative, prejudicial, improper, or otherwise legally incompetent matter as reasons for his opinion. We believe that our cases neither do nor should so hold. That a person qualifies as an expert does not endow his testimony with magic qualities. We think the true rule is that where it is demonstrated during the testimony of an expert that his opinion rests wholly upon reasons which are legally incompetent, there is no right to have his opinion considered as evidence.

As we have seen, the tax board stated that Hill had formed an opinion of fair cash value based in part upon "book cost" and "depreciation reserve"; "also based upon his consideration of the earning capacity," his theory being that fair cash value was equivalent to reproduction cost new less depreciation if the earnings were adequate to support a purchase at that figure; and "also based on a hypothetical sale and lease back of the company's property at a rental which, in his opinion, was sufficient to support the purchase money investment."

The assessors argue that the sale and lease back evidence was only a test to determine whether the earning capacity of the property was sufficient to support a sale at reproduction cost less depreciation. The company, on the other hand, denies that the hypothetical sale and lease transaction was a test of rental value or earning capacity, and argues that it was the entire foundation of the assessors'

evidence of value, and did not apply the proper standard of value; that only the present owner was considered as the seller; that only a very limited class of buyers was considered; that there was a manipulation of the debt ratio; that the gross income of the entire company has been diverted to support the rental on the Boston property alone; and that it was vague in numerous ways, such as the length of term of the lease and the duty to make replacements.

In weighing these contentions, sight should not be lost of the issue, which was the fair cash value of a portion of a single gas system — a portion with limits arbitrarily determined. Practically speaking, the most likely buyer would be one who owned or controlled the rest of the system, and particularly that part located in Everett. At least, it would not be unreasonable for the tax board to entertain such views. Obviously, sales of a truncated system with artificial termini at municipal boundaries must be exceedingly rare, if existent at all. Evidence of relevant actual sales was understandably lacking. Lest a party be deprived of real opportunity to prove his case in these circumstances, much latitude should be permitted the tax board in admitting evidence to assist it as a tribunal of fact. We had this thought in mind in passing upon the assessors' specifications of error. Taking a broad view as to what evidence could be submitted to the selective judgment of the tax board, we held that the company's net earnings after taxes could be shown.

We turn from this summary of reasons underlying the sale and lease transaction to a consideration of the objections. From here on we confine our decision to the precise circumstances of this controversy where the property to be valued was unusual, if not unique, and comprised a fraction, albeit a large one, of a greater system, but nevertheless a fraction for the valuation of which no ordinary standards would serve.

First comes the dispute whether Hill's testimony was a test of earning capacity or was itself the entire foundation of the assessors' evidence of value. Hill in his testimony, the

tax board in its decision, and the assessors in their brief use the word "test" as meaning a check on an estimate of value reached by another method. In other words, figures reached by using the test were not themselves an estimate of value but were a gauge of the reliability of the estimate of value derived by using the other method, which was reproduction cost new less depreciation provided the earnings were adequate to support a purchase at the figure so estimated. The question is whether, upon analysis, the transaction in substance could be found to be such a test. The issue for us is not one of credibility or of weight of the evidence.

We do not discuss refinements of language suggested by the tax board's finding that Hill's opinion of cash value was "also based on a hypothetical sale and lease back." The important thing is that whatever the words used by the board, his estimates were undoubtedly influenced in the manner described, and except in the years 1944 and 1945, the hypothetical sale and lease back at fair rental value, whether called a test or not, led to substantial reductions in those estimates.

The accompanying table[1] presents in brief compass the results of Hill's testimony for the eight years. In the last column one will observe that in the years 1946 to 1951, inclusive, in which Hill felt that his estimates based upon reproduction cost new less depreciation would not support a sale and lease back at fair rental value, his estimates were "leveled downward," to quote the tax board, or "adjusted," to quote the assessors' brief, by amounts varying from $2,300,394 in 1946 to more than $13,000,000 in three of the later years.

Obviously, the test caused no change in Hill's estimates of fair cash value for 1944 and 1945. We think that for the six later years Hill's estimates of fair cash value, although "leveled downward," could be received and considered by the tax board, and that the sale and lease transaction, while exerting a tempering influence upon tentative estimates,

---

[1] See page 582.

| January 1 — | Reproduction Cost. | Depreciation. | Reproduction Cost less Depreciation. | Hill's Estimate of Fair Cash Value. | Excess of Hill's Estimate of Reproduction Cost less Depreciation over his Estimate of Fair Cash Value. |
|---|---|---|---|---|---|
| **1944** Gas Electric | $30,140,954 1,542,020 | $2,361,434 321,628 | $27,779,520 1,220,392 | $27,800,000 1,220,000 | – – |
| Total | $31,682,974 | $2,683,062 | $28,999,912 | $29,020,000 | – |
| **1945** Gas Electric | $31,564,952 1,595,754 | $2,558,360 340,551 | $29,006,592 1,255,203 | $29,000,000 1,250,000 | – – |
| Total | $33,160,706 | $2,898,911 | $30,261,795 | $30,250,000 | – |
| **1946** Gas Electric | $35,226,749 1,666,802 | $2,926,355 363,522 | $32,300,394 1,303,280 | $30,000,000 1,300,000 | $2,300,394 3,280 |
| Total | $36,893,551 | $3,289,877 | $33,603,674 | $31,300,000 | $2,303,674 |
| **1947** Gas Electric | $40,752,401 2,009,537 | $3,448,342 453,632 | $37,304,059 1,555,905 | $31,000,000 1,500,000 | $6,304,059 55,905 |
| Total | $42,761,938 | $3,901,974 | $38,859,964 | $32,500,000 | $6,359,964 |
| **1948** Gas Electric | $46,715,705 2,270,421 | $4,003,540 523,440 | $42,712,165 1,746,981 | $32,000,000 1,700,000 | $10,712,165 46,981 |
| Total | $48,986,126 | $4,526,980 | $44,459,146 | $33,700,000 | $10,759,146 |
| **1949** Gas Electric | $54,010,197 2,684,460 | $4,772,549 643,477 | $49,237,648 2,040,983 | $33,000,000 2,000,000 | $16,237,648 40,983 |
| Tota. | $56,694,657 | $5,416,026 | $51,278,631 | $35,000,000 | $16,278,631 |
| **1950** Gas Electric | $52,206,593 2,677,052 | $4,775,642 647,789 | $47,430,951 2,029,263 | $34,000,000 2,000,000 | $13,430,951 29,263 |
| Total | $54,883,645 | $5,423,431 | $49,460,214 | $36,000,000 | $13,460,214 |
| **1951** Gas Electric | $56,122,015 3,158,983 | $5,231,503 797,448 | $50,890,512 2,361,535 | $35,000,000 2,000,000 | $15,890,512 361,535 |
| Total | $59,280,998 | $6,028,951 | $53,252,047 | $37,000,000 | $16,252,047 |

was not the entire foundation of the assessors' evidence of value. Having determined at what rental the company could operate at a fair return, Hill could form an opinion as to the rent a hypothetical lessee not under compulsion

would pay, and then as to the purchase price a buyer not under compulsion would pay.

The company, however, points out that exhibit X relates only to the year 1944 and to the pro forma year 1952–1953; and that in the years 1945 to 1951 corresponding increases in the rates of return would not result from similar transactions using the same factors, but instead somewhat disastrous consequences would ensue. This observation might well have had a devastating effect on the weight to be accorded the test as a check on estimated fair value. It does not follow, however, that the sale and lease back became the source of the valuation figure rather than a test of an existing tentative valuation. Hill's 1944 estimate survived the test as did that for the pro forma year. Hill could bridge the intervening years with his increasingly higher estimates of fair value which could have been justified by the ever nearing use of natural gas.

There was no error in the marking of exhibit X, which was admissible as a computation by the witness Hill. The company did not ask that the purpose for which the evidence was admitted be limited. *Hubbard* v. *Allyn,* 200 Mass. 166, 171. *First National Bank* v. *Union Hospital of Fall River,* 281 Mass. 64, 71. *Curtin* v. *Benjamin,* 305 Mass. 489, 493. *Moran* v. *School Committee of Littleton,* 317 Mass. 591, 595. *Jasper* v. *Worcester Spinning & Finishing Co.* 318 Mass. 752, 759. In any event, it does not appear that the tax board made an improper use of exhibit X. In its decision the tax board stated, "In determining the fair cash value of the property, both gas and electric, the board considered all the evidence admitted relevant to the issues, including the earnings of the company, the earning capacity of the property, cost of reproduction new less depreciation, book costs and book values, opinions given by experts of the fair cash value of the company's property, the rate of return, the uses for which the property was adapted, the imminence of the advent of natural gas, and that the company was subject to regulation by the department of public utilities." Plainly we cannot say that the tax board's de-

cision was vitiated by error of law. See G. L. (Ter. Ed.) c. 58A, § 13,[1] as appearing in St. 1933, c. 321, § 7, as amended by St. 1953, c. 654, § 27. *Fisher School* v. *Assessors of Boston,* 325 Mass. 529, 533. *Assessors of Everett* v. *Albert N. Parlin House, Inc.* 331 Mass. 359, 364.

But objection is made that a proper standard of value was not applied. We think that it is not accurate to say that Hill considered only one owner or seller. As a case in point as to what might be the earnings in the hands of a lessee, there could be shown what would be the earnings if the property were under lease to the company. In this connection it was not wrong to consider its relations with Eastern. This computation is analogous to the course followed by the company itself in offering its own revenues net after taxes as evidence of the earning capacity of the property in the hands of any owner.

The charge that only a very limited class of buyers was considered lacks validity. Obviously, the number of buyers for this property would not be great. But in showing its value for a purpose for which it was reasonably adapted, there was no requirement that there be any particular number of buyers. In the circumstances, the tax board might properly think that a likely hypothetical buyer of the Boston property would be one who contemplated its operation by the owner of the rest of the system. Hill testified, and the tax board found, that he was not considering only purchasers who would lease back to the company. We are in no position to reverse that finding. The tax board granted the assessors' request for ruling numbered 121: "On all the evidence, the assumed lessee from the assumed buyer is not limited to appellant [company]." We think that this ruling was right.

Other grounds of objection, which might be important to a tribunal dealing with the weight to be accorded testimony, are not presently formidable. The alleged manipulation of the debt ratio was merely an opinion as to what

---

[1] The amendment of this section by St. 1954, c. 681, § 5, did not take effect until July 1, 1955. St. 1954, c. 681, § 22.

would be done with the proceeds of the sale. Since the company would not own the Boston property, its capital would be less by the value of that property, which would be by the amount of the purchase price. There was no error in the refusal of the company's requests numbered 110 to 114, inclusive.

We do not agree with the contention (apparently based on the company's estimates of income) that there would be a diversion of income of the entire company to support the rental of the Boston property. The test, which could be accepted as correct, tended to show that the income of the Boston property would be sufficient to support the rental. This contention seems tantamount to an assertion that a contrary finding was required, which cannot rightly be said where there was such a great difference of opinion as to the amounts properly chargeable to depreciation.

Discussion need not be extended of the charges of vagueness in the terms of the hypothetical lease. Experts in testifying to the value at which property could be sold may give their opinion without presenting details of the contract of sale.

We perceive nothing calling for discussion in other objections to the sale and lease transaction.

The testimony of Kushing and the other evidence offered by the assessors relating to earnings after the advent of natural gas were not inadmissible as speculative or uncertain. There was no error in the denial of the company's requests numbered 119 to 128, inclusive, which are expressly argued, nor in requests numbered 129 to 138, inclusive, which relate to the same subject. It may also be noted that Kushing gave no opinion of fair cash value. His contribution was auxiliary to the testimony of Hill.

For the electric department there was nothing corresponding to exhibit X. The findings of the tax board seem to imply that the same methods and calculations were followed as in the gas department, and Hill's testimony leaves no doubt. No new point is presented.

There was no error in the denial of the company's requests

numbered 103 to 107, inclusive, 139 to 141, inclusive, and 150; in the tax board's statement that "Hill's opinion of fair cash value was also based upon his consideration of the earning capacity of the gas and electric property"; and in granting as modified the assessors' requests numbered 129 and 150.

### THE ASSESSORS' MOTION TO REOPEN THE HEARING.

After the completion of the evidence but before the arguments the assessors moved to reopen the hearing to receive evidence of recent company estimates given to the Federal power commission as to production cost with natural gas. The motion was denied. There was no abuse of discretion.

### CONCLUSION.

In the cases in the Supreme Judicial Court, Suffolk County, numbered 54,704 Law to 54,711 Law, inclusive, the appeals are dismissed. In the cases numbered 55,189 Law to 55,196 Law, inclusive, and numbered 55,303 Law to 55,310 Law, inclusive, the decisions of the Appellate Tax Board were right. The several taxes must be abated in the respective amounts as ordered by the Appellate Tax Board, with interest at four per cent per annum from the dates of payment of the said taxes, with costs.

*So ordered.*