**DIGITAL EQUIPMENT
CORPORATION**
vs.
**BOARD OF ASSESSORS OF THE
TOWN OF MAYNARD**

**No. 1981-351**

Appellate Tax Board
Trial Court of the
Commonwealth of Massachusetts

**December 23, 1981**

**Ansel B. Chaplin, Esq.,** counsel for appellant.
**George P. Luker, Esq.,** counsel for appellee.

These are appeals under the formal procedure pursuant to G.L.c. 59, §§ 64 and 65, as amended, from the refusal of the appellee to abate taxes on certain real estate owned by the appellant for the fiscal years 1978, 1979 and 1980.

These findings of fact and report are made pursuant to G.L.c. 58A, § 13, as amended, **sua sponte** by the Board.
**Case no. 8 351B**

## FINDINGS OF FACT AND REPORT

Appellant, a Massachusetts corporation, was the owner of record of a number of parcels of real estate on Walnut and Sudbury Streets in the Town of Maynard for the fiscal years in issue. The total land area is approximately 37.95 acres; included therein is a pond containing 11.70 acres and parking facilities for approximately 1700 vehicles on approximately 12.10 acres. The land is improved with a total of seventeen individual or interconnected single-story and multi-story mill-type buildings including a smoke stack and a boiler room. Many of the buildings have been or were in the process of rehabilitation including the installation of a number of new thermal-pane windows.

The exterior walls of the buildings are of brick and masonry construction with poured concrete or stone and rubble footings. The roof areas are plywood covered with tar and tar paper. The roof decks are wood frame laid on wood rafters and stringers. The ground floor base flooring is poured concrete and the upper floors are hardwood. The partition walls are brick and floor supports are wooden posts. Most of the ceilings are exposed joists and floor boards from the level above. The lighting is strip-type and boxed fluorescent lamps and also contained in the ceiling area are sprinkler pipes and heads. The wiring throughout the major part of the structures is in rigid conduit pipe and adequate for the use. Both experts fully described the premises and for a more detailed structure-by-structure description, reference is made to Exhibit 3 (appellant's expert) and Exhibit S (appellee's expert).

For each year at issue, seventeen separate petitions were heard and the following, by fiscal year and not docket number, will depict necessary information regarding jurisdiction.

| Fiscal Year | Application for Abatement | Taxes Paid | Denial | Appeal Filed |
|---|---|---|---|---|
| 1978 | Dec. 14, 1977 | Dec. 15, 1977 Apr. 27, 1978 | Feb. 24, 1978 | May 22, 1978 |
| 1979 | Dec. 13, 1978 | Dec. 13, 1978 May 1, 1979 | Mar. 1, 1979 | May 31, 1979 |
| 1980 | Dec. 10, 1979 | Dec. 10, 1979 May 1, 1980 | Mar. 10, 1980 | June 9, 1980 |

Since all of the above-enumerated filings occurred on the same date in the various years, the findings are applicable to all individual docket numbers. After close scrutiny of all documentary evidence and the above filing dates, the board specifically finds that it has jurisdiction to hear these matters.

At the hearing, qualified appraisers testified for both parties and utilized the capitalization of income approach to value for the entire complex and not for individual parcels. The board has adopted the same approach but has also assigned values to the individual parcels in accordance with Appellant's Suggested Distribution of Abatement filed in hearing on November 10, 1980.

Appellant's expert testified that there was a gross rentable area of 1,044,067 square feet. He further stated that he personally measured all of the common areas in all of the buildings, including halls, stairways, lavatories, etc. and found the net rentable area was 898,378 square feet. Based on his experience in the field, he arrived at a figure of $1.50 per square foot as a gross economic rent which translates to a gross economic income of $1,347,567.00. To this figure, he applied a 5% allowance for vacancy and rent loss to arrive at a gross effective in-

come of $1,280,189.00, which he utilized for all three years at issue. The only actual expense which he used in his calculations was that for heat which was $113,233.00, $91,566.00 and $81,288.00, respectively. The decrease was attributed partially to the installation of energy-efficient windows.

He then used his expertise and experience to arrive at the expense figures which were utilized for all three years, including insurance, common area electricity, repairs and supplies, elevators, snow removal and sanding, and legal/audit for a total of $209,757.00. Additionally he included as an expense 21 employees plus employer's wage contributions of F.I.C.A., state and federal unemployment and Blue Cross/Blue Shield and an additional expense for security totaling $387,497.00. He disregarded the actual number of maintenance men (79) employed by the appellant because most of the expense was in the ordinary course of business and there was no separation between business and realty expense. All of the figures are included on pages 60-64 plus two additional unnumbered pages thereafter in Exhibit 3 and reference is hereby made to them.

Thus his net income figures for the three years were as follows:

FY 1978 - $492,901.00
FY 1979 - $514,588.00
FY 1980 - $524,836.00

To these figures he then applied capitalization rates of 23.60%, 24.20% and 24.00%, respectively, to arrive at the following rounded fair cash value figures:

FY 1978 - $2,100,000.00
FY 1979 - $2,150,000.00
FY 1980 - $2,200,000.00

His capitalization rates all included a 10% rate of return, a 5% depreciation factor and the actual tax rate with no reference to a disproportion ratio or an effective tax rate as mandated by case law and/or statute.

Appellee's expert testified to a gross building area of 1,159,976 square feet which was taken from another appraisal report. He then discounted some of the gross as non-rentable and utilized a net figure for square feet of 1,085,068. To this he applied different rental figures of $2.00, $1.00 and $.90 for FY 1978, depending upon the location of either first floor, upper floors and basement, respectively, He arrived at these figures by utilizing alleged comparable rentals, many of which were found to be incorrect and were not used by the board.

He utilized the above figures to find a total potential income of $1,338,829.00 to which he applied a 5% vacancy and rent loss for a total effective income of $1,271,888.00. He then subtracted the following expenses: fuel charges, electricity, insurance, elevator maintenance and repairs, snow removal, repairs and maintenance, management, security and legal/audit for a total of $397,942.00. All of these figures are included on Page 61 of Exhibit S and reference is hereby made to them. None of the figures were based on actual expenses and they were all considered economic. The board considered these expenses as not sufficient for the overall management of such a large complex.

For FY 1978, he utilized a net operating income of $873,946 to which he applied a capitalization rate of .153 consisting of .11 as both a rate of return and depreciation and a tax factor of .043, which was claimed to be an effective tax rate. Thus, he arrived at a fair cash value figure of $5,712,065.

As a so-called reflection of the market, he increased the economic rental figure and the expense figures to arrive at the following:

|  | FY 1979 | FY 1980 |
|---|---|---|
| Total Potential Income | $1,509,095 | $1,627,602 |
| Total Effective Income | 1,433,595 | 1,546,222 |
| Total Expenses | 422,100 | 445,500 |
| Total Net Operating Income | 1,011,495 | 1,100,722 |

To the net operating income, he applied total capitalization rates of .161 and .163, respectively. These were comprised of rates of return and depreciation of .115 and .12 and effective tax rates of .046 and .043. Thus, he arrived at fair cash value figures of $6,283,000 and $6,753,000. Reference is made to Pages 64 and 65 of Exhibit S for the applicable figures.

The board placed more weight on the figures presented by the appellant's expert and found that the figures used by the appellee's expert were not as credible.

The board considered the appraisal reports of both experts and made the following computations regarding the capitalization of income approach to value. The board finds that the gross floor space of all of the buildings was 1,058,545 square feet. It found that the net rentable area was 950,000 square feet. Appellant's expert's approach of merely utilizing the net rentable space presently in existence failed to consider that in a multi-tenant situation some of the existing space may be changed and some of the buildings could be rented on a gross square foot basis.

The board found that a fair economic rent would be $1.50 per square foot for the full 950,000 net rentable square feet. Thus, the gross income would be $1,425,000. By applying a 5% vacancy and rent loss factor, the gross effective income is $1,353,750.

The following expenses were then deducted:

a) management (6%) $81,225.00
b) insurance 20,000.00
c) electricity 45,000.00
d) elevators 25,000.00
e) snow removal 25,000.00
f) repairs & supplies 95,000.00

Additionally, the board utilized an average figure of $92,000 per year as a reasonable cost of heat; and further allowed an additional 20% of the gross effective income for maintenance. Thus, arriving as a rounded figure of $700,000.00 as the net operating income for all three years.

Based on all of the evidence, testimony, exhibits, our examination and analysis of the appraisal reports, stipulations filed and/or made by the parties, a view taken by the board, and the foregoing general and subsidiary findings, the board finds the following values for each year for the entire complex:

1) For FY 1978 the board applied a capitalization rate including return, depreciation and tax factor of .1670 to arrive at a rounded fair cash value of $4,192,000. To this was applied a stipulated disproportionate ratio of 45% to arrive at a fair assessed value of $1,886,400.

2) For FY 1979 the board applied a capitalization rate including return, depreciation and tax factor of .1706 to arrive at a rounded fair cash value of $4,103,000. To this was applied a stipulated disproportionate ratio of 40.5% to arrive at a fair assessed value of $1,661,715.

3) For FY 1980 the board applied a capitalization rate including return, depreciation and tax factor of .1815 to arrive at a rounded fair cash value of $3,857,000. To this was applied an effective tax rate of $43.20 to arrive at a tax burden of $166,622.40

## OPINION

Two issues are raised by these appeals: overvaluation and disproportionate assessment.

As to overvaluation, the standard to be used in determining "fair cash value" is well known and without dispute. It is the price at which a willing seller, not under compulsion to sell, will sell and a willing buyer, not under compulsion to buy will buy the property in question, each party having full knowledge of all relevent facts. **Boston Gas Company v. Assessors of Boston,** 334 Mass. 549 (1950).

The decision of the board, although required to be based upon evidence presented, need not coincide with the valuation given by any witness. The market value of any real estate cannot be determined with mathematical certainty, but must ultimately rest in the realm of

144

opinion, estimate and judgment. **Assessors of Quincy v. Boston Consolidated Gas Company,** 309 Mass. 60 (1941). The board is not required to specify the exact manner in which it arrives at its fair cash value figures. **Jordan Marsh Company v. Assessors of Malden,** 359 Mass. 106 (1971). Use of earning capacity and not actual rents is the proper method for determining gross income. See, **Assessors of Quincy, v. Boston Consolidated Gas Company, supra,** at p. 64.

The board used an effective tax factor in its capitalization rate in arriving at fair market value of the subject property. The purpose of a tax factor in a formula for capitalizing earnings is to reflect the tax which will be payable on the assessed valuation produced by the formula; where the fair cash value determined by the capitalization of earnings is to be reduced in arriving at the assessed valuation, the tax factor must be proportionately reduced. See, **Assessors of Lynn v. Shop Lease Company, Inc.,** 364 Mass. 569, 573 (1974).

As to disproportionate assessment for the fiscal years 1978 and 1979, a taxpayer has a right to have his assessment reduced so that it is "proportional to the assessments of the class of property valued at the lowest percentage of fair cash value." **Assessors of Weymouth v. Thomas E. Curtis and Others Trustees,** 1978 Adv. Sh. 1676, 1684, quoting **Shoppers World, Inc. v. Assessors of Framingham,** 348 Mass. 366, 377 N.E.2d 10 (1965); **Tregor v. Assessors of Boston,** 1979 Adv. Sh. 770.

The board can utilize the equalization studies prepared by the Commissioner in arriving at a figure for the ration of disproportionate assessment. See M.G.L.c. 58A, § 12C; **Tregor, supra,** at p. 779; and **Kenniston v. Assessors of Boston,** 1980 Adv. Sh. 1485 at 1498.

For years beginning in 1980, see G.L.c. 58A, § 14; St. 1979, c. 797, §§ 10 and 14; **Kenniston v. Assessors of Boston,** supra; and Mass. Constitution, Art. 112.

These principles were applied by the board in determining the fair cash value for the appellant's real estate in these appeals.

Our decision was promulgated Dec. 23, 1981.

APPELLATE TAX BOARD

**By John L. Mulvihill, Chairman.**

A True Copy
Attest: **Anthony J. D'Arcangelo**
**First Asst. Clerk of the Board**