## Raytheon Company *vs.* Commissioner of Revenue.

Suffolk. September 8, 2009. - November 10, 2009.

Present: Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Taxation,* Sales and use tax. *Words,* "Sale at retail."

The Appellate Tax Board (board) properly determined that the taxpayer, which
the board found was primarily engaged in the business of producing and
selling defense systems, purchased certain indirect cost items (items) for
the purpose of facilitating the completion of defense systems, rather than
for the purpose of reselling the items to the Federal government in the
regular course of business; therefore, the sales of the items to the taxpayer
were incidental to the taxpayer's business and qualified as "[s]ale[s] at
retail" within the meaning of, and were subject to, the sales tax statute,
G. L. c. 64H, § 2, and the use tax statute, G. L. c. 64I, § 2. [338-345]

Appeal from a decision of the Appellate Tax Board.

The Supreme Judicial Court granted an application for direct appellate review.

*Robert M. Buchanan, Jr. (Samuel B. Bruskin* with him) for the taxpayer.

*Timothy J. Casey,* Assistant Attorney General, for Commissioner of Revenue.

*Frederick J. Nicely, Jana S. Leslie & Todd A. Lard,* of the District of Columbia, *& Kathleen King Parker,* for Council on State Taxation, amicus curiae, submitted a brief.

Botsford, J. This is a sales and use tax case. At issue is the meaning of the term "sale at retail" in the sales and use tax statutes, G. L. c. 64H and G. L. c. 64I, respectively. The Commissioner of Revenue (commissioner) refused to grant the taxpayer, Raytheon Company (Raytheon), an abatement of sales and use taxes relating to certain goods that constituted overhead or indirect cost items purchased by Raytheon in connection with its performance of work on different Federal contracts. Raytheon appealed to the Appellate Tax Board (board), contending that the sales of these indirect cost items to Raytheon fit

within an exception to the statutory definition of a taxable "sale at retail" that applies to sales made for the "purpose" of "resale in the regular course of business." G. L. c. 64H, § 1. The board rejected Raytheon's position, and Raytheon appealed. We granted its application for direct appellate review, and we affirm the board's decision.[1]

1. *Background.* On February 20, 2004, Raytheon filed an application with the commissioner seeking an abatement of sales and use taxes on its purchases of certain indirect cost items for the 2001 taxable year.[2] On May 20, 2004, Raytheon made the same abatement request for the 2002 taxable year.[3] Raytheon, which had obtained a direct pay permit from the commissioner on February 1, 2002 — thereby relieving its vendors from thereafter collecting the sales tax and assuming the direct tax liability itself[4] — claimed that its purchases qualified for the exemption for sales made for the purpose of "resale in the regular course of business" as defined in G. L. c. 64H, § 1. Each abatement request was deemed denied,[5] and Raytheon appealed to the board.[6] After hearing, the board issued a decision and report affirming the denial of Raytheon's abatement requests.

The record before the board included the parties' statement of agreed facts, stipulated exhibits, and the testimony of four witnesses called by Raytheon. Based on this record, the board found as follows. Raytheon is a corporation organized under

---

[1]We acknowledge the amicus brief filed on behalf of Raytheon Company (Raytheon) by the Council on State Taxation.

[2]At all times relevant to this litigation, the applicable sales and use tax in the Commonwealth was five per cent.

[3]The total amount of abatement sought for the 2001 and 2002 taxable years was approximately $700,000 in tax, plus interest.

[4]As a general matter, sales taxes are to be collected and paid by the vendor. See G. L. c. 64H, § 2.

[5]Raytheon had also filed with the Commissioner of Revenue (commissioner) abatement applications for the period before it obtained the direct pay permit on behalf of its vendors who executed "vendor abatement applications," providing Raytheon with powers of attorney. Each of these requests was also deemed denied.

[6]On appeal to the Appellate Tax Board (board) and in this court, Raytheon has not argued that it purchased the indirect cost items at issue as an agent of the United States government, a status that would likely qualify it for the tax exemption available to the United States government. See G. L. c. 64H, § 6 (*d*).

Delaware law with its principal place of business in Massachusetts. At all relevant times, Raytheon was engaged in the business of producing specialized command, control, communication, telecommunication, intelligence, and electronic warfare systems, primarily for sale to the United States government, but also for other purchasers including private companies.

In connection with its government contracts, Raytheon purchases two types of tangible personal property, direct cost items and indirect cost items. Direct cost items are goods such as semiconductor chips, sheets of metal, and testing equipment that are incorporated directly into the manufacturing of Raytheon's final products. See 48 C.F.R. § 9904.418-30(a)(2) (2001) (defining direct cost items as "any cost which is identified specifically with a particular final cost objective"). Direct cost items are not at issue in this appeal. Indirect cost or overhead items are costs "not directly identified with a single final cost objective, but identified with two or more final cost objectives or with an intermediate cost objective." 48 C.F.R. § 9904.418-30(a)(3) (2001). Raytheon's indirect cost items include, but are not limited to: cellular telephones and accessories; food and catering services; toilet paper; trash bags; office furnishings; salt and sand for snow removal; a jukebox; latex gloves; paper; printer toner; and promotional items (for example, lapel pins, golf umbrellas, mugs, and key chains). Although not delivered to the Federal government as final products, the indirect cost items are necessary for the completion of Raytheon's contracts with the government.

Raytheon's use of indirect cost items on government contracts is governed by the Federal Acquisition Regulations (FARs), which set forth standards for Federal government contracts. See 48 C.F.R. c. 1 (2001). These contracts provide for Raytheon to be reimbursed for both direct costs and indirect costs. As for the latter, the FARs require government contractors to assign all of their indirect cost items to indirect cost pools. The cost pools are then allocated across contracts and billed to each government contractor in the appropriate percentage. With respect to Raytheon, government contracts account for approximately eighty-one per cent of its business, and therefore the Federal government is billed for and reimburses eighty-one per cent of Raytheon's indirect cost items.

Under the terms of the FARs, title to the indirect cost items

passes to the Federal government.[7] However, possession of the items remains with Raytheon.[8]

2. *Discussion.* "We will not modify or reverse a decision of the board if the decision is based on both substantial evidence and a correct application of the law." *Boston Professional Hockey Ass'n* v. *Commissioner of Revenue*, 443 Mass. 276, 285 (2005). Although the proper interpretation of a statute is for a court to determine, we recognize the board's expertise in the administration of tax statutes and give weight to the board's interpretations. *Bell Atl. Mobile of Mass. Corp., Ltd.* v. *Commissioner of Revenue*, 451 Mass. 280, 283 (2008). See *Northeast Petroleum Corp.* v. *Commissioner of Revenue*, 395 Mass. 207, 213 (1985) (noting court's "traditional deference to the expertise of the board in

---

[7]Raytheon has both "cost-plus" and "fixed price" contracts with the Federal government. Cost-plus contracts require the government to reimburse Raytheon for certain costs associated with performance of the contract, plus an additional fee. Fixed price contracts are contracts in which the government pays a set price for the contract. Both types of contracts contain similar title-vesting clauses, as required by the Federal Acquisition Regulations (FARs). For example, the regulation relating to fixed price contracts, provides:

"(1) Title to the property described in this paragraph (d) shall vest in the Government. Vestiture shall be immediately upon the date of this contract, for property acquired or produced before that date. Otherwise, vestiture shall occur when the property is or should have been allocable or properly chargeable to this contract.

"(2) *Property*, as used in this clause, includes all of the below-described items acquired or produced by the Contractor that are or should be allocable or properly chargeable to this contract under sound and generally accepted accounting principles and practices.

"(i) Parts, materials, inventories, and work in process; (ii) Special tooling and special test equipment to which the Government is to acquire title under any other clause of this contract; (iii) Nondurable (i.e., noncapital) tools, jigs, dies, fixtures, molds, patterns, taps, gauges, test equipment, and other similar manufacturing aids, title to which would not be obtained as special tooling under subparagraph (ii) above of this clause; and (iv) Drawings and technical data, to the extent the Contractor or subcontractors are required to deliver them to the Government by other clauses of this contract."

48 C.F.R. § 52.232-16(d) (2001). See 48 C.F.R. § 52.245-5 (2001), recodified at 48 C.F.R. § 52.245-1(e) (2008).

[8]Raytheon explained that in rare circumstances it transfers possession of an indirect cost item, such as when a paper copy of a report or memorandum is sent to the government.

tax matters involving interpretation of the laws of the Commonwealth"). See also *CFM Buckley/North, LLC* v. *Assessors of Greenfield*, 453 Mass. 404, 406 (2009). The board's expertise is also given weight when mixed questions of fact and law are considered. See, e.g., *Massachusetts Inst. of Tech.* v. *Assessors of Cambridge*, 422 Mass. 447, 452 (1996); *McCarthy* v. *Commissioner of Revenue*, 391 Mass. 630, 632 (1984).

In this case, the board was tasked with interpreting specific provisions of G. L. c. 64H and G. L. c. 64I, the Massachusetts sales and use tax statutes. General Laws c. 64H, § 2, imposes a sales tax "upon sales at retail in the commonwealth, by any vendor, of tangible personal property or of services performed in the commonwealth." The complementary use tax provides that a tax is "imposed upon the storage, use or other consumption in the commonwealth of tangible personal property or services purchased from any vendor or manufactured, fabricated or assembled from materials acquired either within or outside the commonwealth for storage, use or other consumption within the commonwealth." G. L. c. 64I, § 2. Sales that have already been taxed under the sales tax statute, and sales that are exempt from the sales tax, are exempt from any use tax. G. L. c. 64I, § 7 (*a*) & (*b*).

To be subject to the sales or use tax, a transaction must generally meet the statutory definitions of both "[s]ale" and "[s]ale at retail."[9] The term "sale" is defined to include "any transfer of title or possession, or both . . . of tangible personal property or the performance of services for a consideration, in any manner or by any means whatsoever." G. L. c. 64H, § 1. A "[s]ale at retail" is defined in pertinent part as "a sale of services or tangible personal property or both for any purpose other than resale in the regular course of business." *Id.* Therefore, under the latter definition a sale for the "purpose" of "resale in the regular course of business" qualifies as an exemption from sales and use taxes.[10]

The board concluded that Raytheon did not qualify for an

---

[9] Both of these terms are defined in the definitions section of the sales tax statute, G. L. c. 64H, § 1. The definitions section of the use tax statute, G. L. c. 64I, § 1, provides that the definitions of these two terms shall have the same meaning as in G. L. c. 64H, § 1.

[10] The definition of "sale at retail" by its terms creates an exception to the

abatement of the sales and use taxes imposed because the sales of indirect cost items to it qualified as taxable "[s]ale[s] at retail" within the meaning of G. L. c. 64H, § 1, and G. L. c. 64I, § 1. In so holding, the board focused on the fact that Raytheon, which had the burden of proving its right to the abatement,[11] did not establish that these sales were sales "for resale in the regular course of business." Rather, in the board's view, the indirect cost items purchased by Raytheon were incidental to the performance of its government contracts and "merely served to facilitate the completion of those contracts."[12] We agree.

Raytheon contends that the board's conclusion is incorrect. Specifically, Raytheon argues that it purchased the indirect cost items at issue because they were necessary to perform Raytheon's contracts with the Federal government — a point agreed to

otherwise inclusive scope of the definition: a sale "for any purpose *other than* resale in the regular course of business." G. L. c. 64H, § 1. Conceptually, however, this exception is the equivalent of a tax exemption for any sale that is "for [the] purpose [of] resale in the regular course of business," and we generally refer to it as an exemption in this opinion.

[11]See, e.g., *Circuit City Stores, Inc.* v. *Commissioner of Revenue*, 439 Mass. 629, 633 (2003) ("taxpayer has the burden of proving as matter of law its right to an abatement of the tax").

[12]In its decision, the board appeared to question whether there were any resales at all by Raytheon of the indirect cost items that were sold to it. Raytheon devotes considerable effort in its brief to establishing that resales did in fact occur. We are not convinced that the board reached a conclusion as to whether resales occurred; its decision is unclear on the point. Nevertheless, we agree with Raytheon, as does the commissioner, that there were both sales and resales involved here. The statutory definition of "[s]ale" is satisfied when there is a transfer of "title *or* possession, *or*" both for consideration (emphasis added). G. L. c. 64H, § 1. In this case, it is not disputed that each vendor of the indirect cost items at issue first transferred possession and title of such items to Raytheon for consideration. Each of these transactions between the vendor and Raytheon thus qualifies as the first or original sale. Raytheon then transferred title (but generally not possession) to the United States in accordance with provisions of the FARs and the terms of Raytheon's contracts with the Federal government. These transfers of title qualified as resales of the same indirect cost items that Raytheon had purchased from the vendors. See *In re Am. Pouch Foods, Inc.*, 769 F.2d 1190, 1193-1197 (7th Cir. 1985), cert. denied, 475 U.S. 1082 (1986) (government contract containing title vesting clause is to be read literally, allowing for more than transfer of security interest to government); *Northrop Grumman Corp.* v. *County of Los Angeles*, 134 Cal. App. 4th 424, 435 (2005), cert. denied, 549 U.S. 817 (2006) (holding that under title vesting clauses, overhead property allocated to government contracts becomes property of Federal government).

by the board[13]; that pursuant to the contracts and the FARs incorporated into them, Raytheon was required to transfer, and the United States government accepted and reimbursed Raytheon for, title to eighty-one per cent of the indirect cost items allocated to indirect cost pools; and that the "inherent nature" of Raytheon's business required compliance with the contract terms and the FARs, including their title transfer provisions. Pointing to the statutory definition of "sale at retail," Raytheon argues that each of these transactions qualifies for an exemption because the resale occurred in the ordinary course of Raytheon's business of performing its contracts with the government.

The argument fails. Raytheon relies entirely on the latter portion of the definition of "sale at retail," that is, whether the resale of the indirect cost items to the Federal government occurred "in the regular course of [its] business." By doing so, Raytheon ignores the definition's language that requires assessing the "purpose" of the original sale. See G. L. c. 64H, § 1.[14] It is not enough to ask whether title to the indirect cost items passed in the regular course of Raytheon's business with the government; the correct inquiry is whether Raytheon purchased the indirect cost items *for the purpose of resale* in the regular course of its business.

As the board recognized, the answer to this question is supplied by previous decisions of this court. In considering whether a particular type of sale by a business qualifies as a sale for the "purpose [of] resale in the regular course of business" and thus is exempt from sales tax, the court has held consistently that one must look to "the inherent nature of the business in question." *Clark Franklin Press Corp.* v. *State Tax Comm'n*, 364 Mass. 598, 602 (1974).[15] Put slightly differently, it is necessary to consider whether the resale or resales were themselves directly

---

[13]The board stated in its decision that it did "not dispute Raytheon's contention that the [indirect cost] items were necessary to Raytheon's ability to complete its government contracts."

[14]As explained above, the definition in G. L. c. 64H, § 1, states: " 'Sale at retail' or 'retail sale', a sale of services or tangible personal property or both *for any purpose other than resale in the regular course of business*" (emphasis added).

[15]In *Clark Franklin Press Corp.* v. *State Tax Comm'n*, 364 Mass. 598 (1974), the court addressed whether the taxpayer, a printing and lithograph

part of the regular course of the taxpayer's business, or were "incidental to the [taxpayer's] business, serving to facilitate the consummation of the principal transactions." *Jan Co. Cent., Inc.* v. *Commissioner of Revenue*, 405 Mass. 686, 689 (1989).[16] See *Prince* v. *State Tax Comm'n*, 366 Mass. 470, 473-474 (1974) (amusement park operators subject to sales or use taxes on prizes awarded to game contestants because prizes were

---

business, was entitled to an abatement of sales taxes imposed in connection with its transfer of printed travel brochures to its parent company, American International Travel Service, Inc. (AITS), which was in the business of arranging group travel tours for organizations. *Id.* at 600. Franklin Press printed and sent the travel brochures to AITS, which then distributed them to its customer organizations as a means of interesting the organizations' members in a particular trip. *Id.* AITS did not charge a separate fee to its customer organizations for the brochures, but the brochures' cost was included in the selling price of the entire "service package" sold by AITS to the organizations. *Id.* at 600-601. Franklin Press argued that it was entitled to a tax abatement because its sale of the brochures to AITS were not sales at retail, since AITS acquired the brochures from Franklin Press to resell them, as part of its entire travel service package, to its customers. *Id.* at 601-602. Thus, Franklin Press argued, its sales of the brochures to AITS "were transfers for resale in the regular course of [AITS's] business." *Id.* at 602. The court rejected the "rather simplistic approach" of this argument, stating:

> "The mere fact that AITS eventually delivered these brochures to its customers does not establish that it resold the brochures in 'the regular course of business.' That language must find its meaning in the inherent nature of the business in question. AITS is in the business of selling travel services, not brochures. The transfer of brochures constituted only an insignificant part of AITS's transactions with its customers, and it is obvious that the services provided by AITS were the predominant factor in the charges made to its customers."

*Id.*

[16]At issue in *Jan Co. Cent., Inc.* v. *Commissioner of Revenue*, 405 Mass. 686 (1989), was whether the plaintiff taxpayer (Jan Co.), a corporation that owned and operated several Burger King franchises in Massachusetts, was liable for sales or use taxes on the paper and plastic products (e.g., paper napkins, straws, plastic forks) it purchased and provided to customers with their food and drink orders. *Id.* at 687. Jan Co. argued that its purchases of these products were exempt from taxation because it bought the items for the purpose of reselling them to its customers. *Id.* at 688. In rejecting Jan Co.'s argument, the court held that the inherent nature of Jan Co.'s business was to provide food and drink to its customers, and the paper and plastic products provided were incidental; they merely facilitated the main goal of the business. *Id.* at 689-690. As the products were not acquired by Jan Co. for the purpose of resale in the regular course of its business, Jan Co. was subject to taxation under the "sale for retail" language. *Id.* at 690, 692.

incidental and merely served to entice contestants to play games). Cf. *Coca Cola Bottling Co. of Northampton* v. *Commissioner of Revenue*, 393 Mass. 726, 729-730 (1985) (plaintiff manufacturer of soft drinks had dominant purpose other than reselling returnable containers, mainly reuse of those containers; for these and other reasons, sale for resale exemption not available to plaintiff).[17]

In this case, the board found that "Raytheon was primarily engaged in the business of producing and selling defense systems."[18] Given this determination, the board could properly find that the indirect cost items were intended to facilitate Raytheon's completion of defense systems and were not purchased by Raytheon for the purpose of reselling them to the Federal government in the regular course of its business.[19]

Other State courts have considered the question whether their

---

[17]In *Coca Cola Bottling Co. of Northampton* v. *Commissioner of Revenue*, 393 Mass. 726 (1985), we suggested that if the taxpayer acquires tangible personal property both for the purpose of resale and for some other purpose, the sale for resale exemption does not apply. *Id.* at 728-729 ("the sales here would be [taxable] sales at retail because there was a purpose to the purchase other than resale"). See W.G. Van Dorn & M.S. Allen, Taxation § 11:10, at 527 (5th ed. 2009). We do not need to consider whether Raytheon had more than one purpose in acquiring the indirect cost items; such an inquiry would be relevant only if we were to find that Raytheon acquired the items for the purpose of resale, which we do not.

[18]Raytheon disputes whether this finding by the board is a finding of fact, and, if it is, whether it is based on substantial evidence. Certainly, the determination is based on factual evidence contained in the record, including in particular Raytheon's 2001 and 2002 annual reports. At the very least, the board's determination regarding the inherent nature of Raytheon's business is a mixed question of fact and law that is owed "some deference." See *Massachusetts Inst. of Tech.* v. *Assessors of Cambridge*, 422 Mass. 447, 452 (1996), quoting *Koch* v. *Commissioner of Revenue*, 416 Mass. 540, 555 (1993) ("in reviewing mixed questions of fact and law, the board's expertise in tax matters must be recognized, and its decisions are due 'some deference' ").

[19]Additional support for the board's conclusion that Raytheon is not in the business of buying indirect cost items for the purpose of resale to the Federal government can be found in the FARs. Title to overhead property not delivered to or incorporated into the end product vests in the contractor on completion of all obligations due under the contract. See 48 C.F.R. § 52.232-16(d)(6) (2001). Therefore, Raytheon retains possession of the indirect cost items and may, in some instances, reacquire title to them. Although title passing back to Raytheon pursuant to this regulation does not change the fact that a resale by Raytheon to the Federal government occurred at the time title vested in the government, it does tend to show that Raytheon's original purchase of the

respective sales or use tax statutes apply to a government con-
tractor's purchases of indirect cost items where title to a portion
of the purchases is transferred to the United States government
under the terms of contracts and the FARs. See *Motorola, Inc.*
v. *Arizona Dep't of Revenue*, 196 Ariz. 137 (Ct. App. 1999);
*Aerospace Corp.* v. *State Bd. of Equalization*, 218 Cal. App. 3d
1300 (1990); *McDonnell Douglas Corp.* v. *Director of Revenue*,
945 S.W.2d 437 (Mo. 1997); *Strayhorn* v. *Raytheon E-Systems,
Inc.*, 101 S.W.3d 558 (Tex. Ct. App. 2003) (*Strayhorn*). Ray-
theon argues that in almost all of these cases the court was con-
sidering sales and use tax provisions, including a sale for resale
exemption, that were very similar if not almost identical to their
Massachusetts statutory counterparts. In Raytheon's view, we
should follow the lead of these courts and conclude, as most of
them did, that no sales or use tax may be charged because the
statutory sale for resale exemption applies.

We decline to travel down the path that Raytheon lays out for
us. Although the statutory provisions discussed in the cited
State court cases are indeed very similar to the relevant provi-
sions of the Massachusetts sales and use tax statutes, those deci-
sions do not provide a useful interpretive guide in this instance.
See *Macy's East, Inc.* v. *Commissioner of Revenue*, 441 Mass.
797, 807 (2004) (law in other jurisdictions could not serve as
source for interpreting provision of Massachusetts corporate ex-
cise tax scheme and implementing regulation at issue). A review
of these decisions reveals that none of the courts has taken the
interpretive approach to its State's sale for resale exemption that
this court consistently has taken. That is, none of them has con-
sidered "the inherent nature of the business in question," *Clark
Franklin Press Corp.* v. *State Tax Comm'n*, 364 Mass. at 602, in
seeking to determine whether a particular sale or type of sale was
for "the purpose [of] resale in the regular course of business," or
whether a particular sale for resale is merely "incidental" to the
taxpayer's business rather than its central focus. *Jan Co. Cent.,*

indirect cost items was not made for the purpose of that resale. The same
regulation on revesting title also supports the view that while the Federal
government does acquire title to a contractor's indirect cost items during the life
of a contract, the government's purpose in doing so is not to acquire permanent
ownership of the items but to secure the government's financial investment in
the contract.

*Inc.* v. *Commissioner of Revenue*, 405 Mass. at 690. Thus, in a number of the other States, the courts reached the conclusion that the statutory sale for resale exemption from tax applied based solely on the fact that title of the indirect cost items passed to the Federal government. See *Motorola, Inc.* v. *Arizona Dep't of Revenue*, 196 Ariz. at 141-145 (in both cost price and fixed price contracts, title to tangible personal property purchased by Motorola and used as overhead passed to government; as result, resale exception applied); *McDonnell Douglas Corp.* v. *Director of Revenue*, 945 S.W.2d at 440 (as long as title to property was transferred, plaintiff taxpayer entitled to sale for resale exemption). In this case, there is no question that title to the indirect cost items at issue passed to the United States, but, as the previous discussion reflects, that fact does not end the inquiry.[20]

The case on which Raytheon most heavily relies is *Strayhorn*. As described in the Texas court's decision, the taxing authority in that case (comptroller) argued in part that Raytheon did not sell or transfer the indirect cost items at issue in the "normal course of business," and therefore Raytheon's purchases were not exempt under the sale for resale exemption. In a brief discussion of the point, the court rejected the comptroller's position. In particular, the court reasoned that Raytheon's "normal course of business" was the performance of its contracts with the Federal

[20]Raytheon also cites *United Techs. Corp.* v. *Groppo*, 238 Conn. 761 (1996) (*Groppo*). The terms of the contracts between the plaintiff taxpayers and the Federal government in *Groppo* appear to be quite different from the terms of Raytheon's contracts — at least with respect to indirect cost items, see *id.* at 765-766 — which makes comparison of *Groppo* to this case difficult. It is also worth pointing out that the court's discussion in *Groppo* of the Connecticut sale for resale exemption in connection with contract services parallels this court's statutory interpretation. The Connecticut court stated:

> "The law concerning sales for resale is clear. The court must look to the intention of the parties to the contract to determine whether the items in a contract are held for resale or were purchased for a different purpose. . . . Where the transaction is only incidental to a service performed for the purchaser, it is not considered a resale for tax purposes."

*Id.* at 775. In applying this test, the court held the services purchased by the plaintiffs in connection with performing their government contracts, including testing, personnel, computer and data processing, stenographic, and engineering services, were incidental to the "primary purpose of the government contracts," the development of a fuel cell, and therefore did not qualify for the sale for resale exemption. *Id.* at 766, 777.

government. Because Raytheon purchased the indirect cost items to perform those contracts, and title to the items passed to the government in the course of contract performance, Raytheon "sold the items to the federal government in the normal course of business." *Strayhorn*, 101 S.W.3d at 567.

The Texas court's analysis in *Strayhorn* is essentially the same as that advanced by Raytheon in this case, and we accept it as far as it goes. That is, we accept that Raytheon, in the regular course of performing its contracts with the Federal government, purchases indirect cost items that it uses in its contract performance, and that, by virtue of the contract terms and the FARs, Raytheon transfers title to these items to the government — which qualifies as a "sale" under G. L. c. 64H, § 1. But the fact that Raytheon thus "sells" items to the Federal government in the regular course of its business does not mean that it purchased these items *for the purpose of* resale. For the reasons previously discussed, we agree with the board that in this case, the resale of indirect cost items to the United States was incidental to Raytheon's business, facilitative rather than central to it. *Jan Co. Cent., Inc.* v. *Commissioner of Revenue*, 405 Mass. at 689-690.

Last, Raytheon argues that if its purchases of indirect cost items for government contracts are subject to Massachusetts sales and use taxes, it will be at a significant competitive disadvantage in comparison with government contractors located in States such as California and Texas, where the courts have held that the purchases are exempt from tax. The argument is speculative.[21] Moreover, if Raytheon believes that its competitive standing as a Federal contractor is being injured by the tax statutes in the Commonwealth, its remedy lies with the Legislature. See, e.g., *Joslyn* v. *Chang*, 445 Mass. 344, 352 (2005), quoting *Spring* v. *Gray*, 22 F. Cas. 978, 985 (C.C.D. Me. 1830) ("if there are any inconveniences or hardships growing out of . . . a [court's statutory] construction, it is for the legislature").

*Decision of the Appellate Tax
Board affirmed.*

---

[21]Raytheon concedes that under the terms of its government contracts, the government reimburses it for any sales or use taxes it pays for indirect cost items, suggesting that the government is certainly aware that some of its contractors will present it with reimbursable tax liabilities.