CYPHER, J.
**108 This is an appeal by the board of assessors of Boston (assessors) from a decision of the Appellate Tax Board (board) abating taxes on certain personal property in Boston owned by and assessed to Veolia Energy Boston, Inc. (Veolia), for fiscal year (FY) 2014. The question presented is whether the taxed personal property, "consisting principally of pipes" that Veolia used to produce, store, and distribute steam, is exempt from local taxation in accordance with G. L. c. 59, § 5, Sixteenth (3) (clause 16 [3] ), which provides **109 in pertinent part that all property owned by a manufacturing corporation, "other than real estate, poles and underground conduits, wires and pipes," is exempt from local taxation (emphasis added).
Veolia produces and distributes steam through networks of pipes and appurtenant equipment. The board found that these networks, including the pipes at issue here, operate in concert as a single, integrated machine, and, as a result, concluded that the pipes constituted machinery exempt from local taxation in accordance with clause 16 (3). On appeal, the *769 assessors argue that the board erroneously relied on the so-called "great integral machine" doctrine, stated for the first time by this court in Commonwealth v. Lowell Gas Light Co., 12 Allen 75, 78 (1866), in concluding that the pipes constituted exempt machinery because such a conclusion is belied by the plain language of clause 16 (3), which explicitly excepts "pipes" from the exemption.
For the reasons that follow, we conclude that pipes that constitute machinery are exempt from local taxation in accordance with clause 16 (3). We further conclude that the great integral machine doctrine, which has endured without legislative interference for well over one hundred years, remains an appropriate means by which to determine whether certain property constitutes machinery. Accordingly, we affirm the decision of the board.
Background. The dispute between the parties began when Veolia was assessed a personal property tax of approximately $2 million on certain pipes it used to produce, store, and distribute steam for FY 2014.[1] Veolia paid the tax due and timely filed an application for abatement with the assessors, arguing that the pipes at issue were in fact machinery, and therefore exempt from local taxation in accordance with clause 16 (3).[2] The assessors denied the application for abatement, and Veolia appealed to the **110 board, which reversed.
The board held an evidentiary hearing over two days and considered testimony from four witnesses: the director of system operations for Veolia North America, an affiliate of Veolia, who testified about Veolia's operations; a managing director of the energy practice at Navigant Consulting, who gave expert testimony regarding Veolia's operating systems; the vice-president and head of finance for Veolia North America, who discussed Veolia's financial reporting; and a director of personal property for the assessing department of the city of Boston, who testified about the contested assessment. The board also considered exhibits entered into evidence and a statement of agreed facts with attachments. We summarize the board's findings.[3]
Veolia owns and operates a "district energy network" in Boston and assists in the operation of a similar network in Cambridge. The Boston network converts chemical energy from natural gas and fuel oil into high-pressure steam and then distributes the high-pressure steam to approximately 250 commercial, healthcare, government, institutional, and hospitality customers. Veolia's customers use the steam at customized pressures for various *770 purposes, including power generation, sterilization, heating, and cooling.
Veolia's steam manufacturing process begins at one of three generation facilities: the Kneeland Facility, located on Kneeland Street in Boston; the Scotia Facility, located on Scotia Street in Boston; and the Kendall Station Facility, located in Cambridge. These generation facilities perform a number of functions, including water treatment, fuel treatment and storage, and high-pressure steam generation. The equipment varies from facility to facility, with two using boilers and one using boilers as well as a heat recovery steam generator as means to generate steam.
Once one of the facilities generates steam, it enters a pressure-regulated network of distribution mains and appurtenant equipment. The networks operate together to balance customer load and steam generation across the generation facilities to ensure equivalent rates of production and consumption. The steam is stored and transported through pipes within the networks. By design, **111 these pipes expand, contract, and move to withstand pressure and heat fluctuations. Also, they are equipped with valves to control pressure, to shed condensate (steam that has returned to liquid state), and to direct the flow of steam.
The pressure of the steam is highest at the point of generation. Once steam reaches a customer's site, a pressure reduction valve reduces that pressure to assure safety, to comply with regulatory requirements, and to conform to customer equipment compatibility and use requirements. After a customer uses the steam, the networks condense it into condensate, some of which the networks return to the generation facilities through condensate-return lines for further steam production.
The networks employ a centralized supervisory control and data acquisition (SCADA) system to monitor their activity. The SCADA system is accessible via the Internet and at several places in the networks. Each of the generation facilities also has an internal control system that feeds data to the master SCADA system. A system shift supervisor directs operations of the entire SCADA system, monitoring the networks, the status of the generation facilities, the status of multiple monitoring points in the networks, and the status at key customer sites.
Veolia's system operations expert opined that the networks, including the pipes at issue, functioned as a single, integrated machine. He noted the importance of the storage and system flow pressure functions served by the pipes, stating that "steam is not like an instantaneous product, like electricity. When you flip a switch, you just don't have instant steam. You have to build up pressure in the system, and so you have to have that stored amount of energy in the system to really operate it." He emphasized also that the steam "is not a finished product until it's delivered to the customer through their control valves and provided to them for use in their energy services."
The board found the expert's testimony credible and agreed with his determination that the networks, including the pipes at issue, constituted and operated as a "single, integrated machine." Relying on Lowell Gas Light Co., 12 Allen 75, and Lowell Gas Co. v. Commissioner of Corps. & Taxation, 377 Mass. 255, 385 N.E.2d 991 (1979), for the proposition that property that would otherwise be regarded as taxable personal or real property will be exempt "when incorporated as an integral part of exempt machinery," the board concluded that the pipes were in fact machinery exempt from taxation pursuant to clause 16 (3).
**112 *771 Discussion. 1. Standard of review. "We accord the board's decision great deference and will not disturb its decision if [it] is based on both substantial evidence and a correct application of the law" (quotation and citation omitted). AA Transp. Co. v. Commissioner of Revenue, 454 Mass. 114, 118, 907 N.E.2d 1090 (2009). A question of statutory interpretation is a question of law for us to resolve. Id. See WorldWide TechServices, LLC v. Commissioner of Revenue, 479 Mass. 20, 26, 91 N.E.3d 650 (2018) (board's conclusions of law reviewed de novo). Nevertheless, "because the board is an agency charged with administering the tax law and has expertise in tax matters, we give weight to its interpretation of tax statutes, and will affirm its statutory interpretation if that interpretation is reasonable" (quotation and citations omitted). AA Transp. Co., supra at 119, 907 N.E.2d 1090. See Northeast Petroleum Corp. v. Commissioner of Revenue, 395 Mass. 207, 213, 479 N.E.2d 163 (1985) (noting court's "traditional deference to the expertise of the board in tax matters involving interpretation of the laws of the Commonwealth"); French v. Assessors of Boston, 383 Mass. 481, 482, 419 N.E.2d 1372 (1981) ("We have long recognized the board's expertise in tax matters"). "[T]he decision of the board is 'final as to findings of fact' " (quotation omitted). Commissioner of Corps. & Taxation v. Boston Edison Co., 310 Mass. 674, 676, 39 N.E.2d 584 (1942), citing G. L. (Ter. Ed.) c. 58A, § 13. See Rosse v. Commissioner of Revenue, 430 Mass. 431, 433, 720 N.E.2d 791 (1999) (" [G. L.] c. 58A, § 13, limits the scope of our review of the board's findings of fact"). In addition, the board's expertise is given due weight when mixed questions of fact and law are considered. Raytheon Co. v. Commissioner of Revenue, 455 Mass. 334, 338, 916 N.E.2d 372 (2009). See, e.g., Massachusetts Inst. of Tech. v. Assessors of Cambridge, 422 Mass. 447, 452, 663 N.E.2d 567 (1996) ; McCarthy v. Commissioner of Revenue, 391 Mass. 630, 632, 462 N.E.2d 1357 (1984).
The assessors argue that the board erroneously relied on the great integral machine doctrine stated in Lowell Gas Light Co., supra, in concluding that the pipes constituted exempt machinery because the plain language of clause 16 (3) explicitly excepting "pipes" from exemption belies such a conclusion. In the assessors' view, the Legislature's latter inclusion of "pipes" in the statute abrogates the great integral machine doctrine, at least to the extent it applies to pipes.[4] Veolia responds that where pipes are components of machinery, they are exempt, notwithstanding **113 the plain language of clause 16 (3) excepting pipes, because the great integral machine doctrine has retained its efficacy notwithstanding the addition of "pipes" to clause 16 (3).
2. Clause 16 (3) exemption for machinery. General Laws c. 59, § 2, subjects all real and personal property situated within the Commonwealth to local taxation, unless such property is specifically exempt. Specifically, "[u]nderground conduits, wires and pipes laid in public ways, ... and poles, underground conduits and *772 pipes, together with the wires thereon or therein, laid in or erected upon private property ... shall be assessed to the owners thereof in the towns where laid or erected." G. L. c. 59, § 18, Fifth (governing assessment of personal property). General Laws c. 59, § 5, details various exemptions to local taxation. In the case of manufacturing corporations, clause 16 (3) exempts from local taxation all property owned by the corporation, "other than real estate, poles and underground conduits, wires and pipes."[5] Said another way, manufacturing corporations are subject to local taxation on real estate, poles and underground conduits, and wires and pipes, and are exempt from local taxation on personal property, which by necessary implication includes machinery. See, e.g., Boston Edison Co. v. Assessors of Boston, 402 Mass. 1, 22, 520 N.E.2d 483 (1988) (manufacturing corporation is not subject to local taxation on its machinery).
Although commonly referred to as an exemption for machinery, clause 16 (3) is not a true exemption from taxation. As described infra, property not taxed to a corporation under G. L. c. 59, § 5, Sixteenth, is taxed indirectly because it is included in the measure of the excise tax imposed on the corporation under G. L. c. 63. See York Steak House Sys., Inc. v. Commissioner of Revenue, 393 Mass. 424, 424-425, 472 N.E.2d 230 (1984) (clause 16 [3] does not free corporation from all taxation; exempt machinery is not subject to local tax, but corporation is liable to taxation by Commonwealth under G. L. c. 63); Fernandes Super Mkts., Inc. v. State Tax Comm'n, 371 Mass. 318, 319, 357 N.E.2d 296 (1976) (" Section 5, Sixteenth, **114 read with the relevant sections of G. L. c. 63, merely determines which governmental unit may impose a tax upon, or measured by, particular property. Property not taxed to a corporation under § 5, Sixteenth, is included in the measure of the excise imposed on the corporation under G. L. c. 63, and thus is indirectly taxed"). See generally C.K. Cobb, Tax Law in Massachusetts 1629-2000, at 21-22 (1999); P. Nichols, Taxation in Massachusetts 249-251 (3d ed. 1938) (Nichols).
The legislative approach to corporate taxation generally, and, indeed, to taxation of machinery used in manufacturing specifically, has evolved over the years. "Under the early tax acts a domestic corporation was assessed for its real estate only, while its personal property was reached for taxation only through an assessment upon the shareholders based upon the market value of the shares." New England & Savannah S.S. Co. v. Commonwealth, 195 Mass. 385, 386, 81 N.E. 286 (1907), citing Salem Iron Factory, Co. v. Danvers, 10 Mass. 514, 517 (1813) (corporation is taxable for its real estate only in town where real estate lies). By virtue of St. 1832, c. 158, all manufacturing machinery became taxable locally. St. 1832, c. 158, § 2 ("all the machinery employed in any branch of manufactory, and belonging to any corporation ... shall be assessed in the respective cities, towns or other places, wherein such machinery may be situated or employed"). See generally Nichols, supra at 281. In the decades that followed, we explained that the meaning of this and other related statutes providing for local taxation of manufacturing machinery "must be ascertained from [their] words, interpreted according to the common and approved usage of the language, regard being given to the nature of *773 the property involved, to the practical administration of tax laws and to the operation of the statute as a workable piece of legislation," and noted that such statutes "do not lend themselves to a narrow or technical construction." Hamilton Mfg. Co. v. Lowell, 274 Mass. 477, 486, 175 N.E. 73 (1931). See Boston & Me. R.R. v. Billerica, 262 Mass. 439, 447, 160 N.E. 419 (1928) ("the general words touching local taxation of machinery were intended to be given their natural scope and not to be interpreted in any constricted sense").
When the Legislature enabled local taxation of machinery, it simultaneously allowed corporations to deduct the value of the taxed machinery from the value of the shares taxable to the shareholders, prudently avoiding double taxation. See St. 1832, c. 158, § 2 ("all machinery employed in any branch of manufactory, and belonging to any corporation, copartnership, person or **115 persons of this or any other State, shall be assessed in the respective cities, towns or other places, wherein such machinery may be situated or employed; and, in assessing the shares in any manufacturing corporation, there shall first be deducted from the value thereof, the value of the machinery and real estate belonging to such corporation"); Rev. St. 1836, c. 7, § 10, Second. See Boston Edison Co., 310 Mass. at 681, 39 N.E.2d 584.
In 1864, the Legislature moved from a local tax on corporate shares paid by shareholders to an excise tax on the market value of all shares paid by the corporation, collected centrally and distributed to cities and towns. See St. 1864, c. 208 (requiring corporations to pay tax, in nature of excise on their franchise, upon excess of market value of capital stock or aggregate of shares over value of real estate and machinery assessed in town or city where situated).[6] See Commissioner of Corps. & Taxation v. Springfield, 321 Mass. 31, 40, 71 N.E.2d 593 (1947) (discussing purpose and effect of corporate franchise tax). See generally Nichols, supra at 579. In making that change, the Legislature was careful to exclude real estate and machinery taxed locally from the value on which the corporate excise tax was levied. See St. 1864, c. 208, §§ 5, 8, 15; Lowell Gas Light Co., 12 Allen at 76 (gas company's pipes, mains, and meters are "machinery," deducted from market value of capital stock in ascertaining taxable amount under St. 1864, c. 208). Thereafter, the Legislature authorized local taxation of underground conduits, wires, and pipes, and later poles, and added those items to the list of exclusions from the value subject to the excise. See St. 1902, c. 342 (underground conduits, wires, and pipes); St. 1909, c. 439, § 2 (poles); Simplex Elec. Heating Co. v. Commonwealth, 227 Mass. 225, 229-230, 116 N.E. 501 (1917) ("By St. 1902, c. 342, underground conduits, wires and pipes were made locally taxable and their value was deducted from the corporate franchise tax"). See generally Nichols, supra at 587-588. See also St. 1921, c. 486, § 16 (inserting "poles, underground conduits, **116 wires and pipes," in G. L. c. 59, § 5, Sixteenth). In 1924, the Legislature extended local *774 taxation to machinery used by nonmanufacturing business corporations. St. 1924, c. 321, § 1 (replacing "machinery used in manufacture" with "machinery used in the conduct of the business" in G. L. c. 59, § 5, Sixteenth). See Assessors of Haverhill v. J.J. Newberry Co., 330 Mass. 469, 471, 115 N.E.2d 139 (1953).
In a marked shift in 1936, in the wake of the Great Depression and in response to an alarming decline in manufacturing within the Commonwealth, the Legislature enacted St. 1936, c. 362, "An Act exempting the machinery of manufacturing corporations from local taxation and changing the methods of determining certain corporation taxes and of distributing certain taxes," which had the effect of broadly exempting all machinery used in manufacturing from local taxation.[7] See Commissioner of Corps. & Taxation v. Assessors of Boston, 321 Mass. 90, 95-96, 71 N.E.2d 874 (1947). See also 1936 House Doc. No. 143 (detailing decline in manufacturing, resulting in unemployment for "hundreds of thousands of skilled workmen" and stating that "[i]dle factories and abandoned mills are the silent and convincing evidence of the disaster that has come upon our people"). See generally Nichols, supra at 224. "The object of St. 1936, c. 362, § 1, was to encourage manufacturing in this Commonwealth by removing the burden of local taxation upon the machinery, and by substituting therefor a tax at the rate of [five dollars] per thousand in the assessment of the corporate franchise tax." Commissioner of Corps. & Taxation, supra at 95, 71 N.E.2d 874. "It was apparently thought that this exemption would check the decrease in manufacturing which had for years been in progress, and that this change in taxation might attract new manufacturing to this State." Id. at 95-96, 97, 71 N.E.2d 874 (aim of statute granting exemption to stimulate manufacturing). See Assessors of Boston v. Commissioner of Corps. & Taxation, 323 Mass. 730, 741, 84 N.E.2d 129 (1949) ("statutes granting exemption from the local tax on the machinery of corporations engaged in manufacturing must be fairly construed and reasonably applied in order to effectuate the legislative intent and purpose to promote the general welfare of the Commonwealth by inducing new industries to locate here and to foster the expansion and development of our own industries, so **117 that the production of goods shall be stimulated, steady employment afforded to our citizens, and a large measure of prosperity obtained"). See generally Nichols, supra at 249-251.
With this purpose in mind, we have not construed the exemption "technically or narrowly." Assessors of Swampscott v. Lynn Sand & Stone Co., 360 Mass. 595, 597-598, 277 N.E.2d 97 (1971), citing Commissioner of Corps. & Taxation, 321 Mass. at 92-97, 71 N.E.2d 874 ("all machinery" of manufacturing corporation, "at least so far as reasonably related to and used in manufacturing operations," must be treated as exempt from local taxation by virtue of clause 16 [3] ). Relatedly, we have not taken a narrow view of what constitutes "machinery."
"Speaking broadly, we are of opinion that a mechanical device which can fairly be said to be a machine must be treated as 'machinery' under [ G. L. c. 59, § 5, Sixteenth]. To hold otherwise would render the statute unworkable. Until a given machine had been passed on by the *775 board or this court, no one could say with any certainty whether it was or was not 'machinery.' To say that one machine was 'machinery' and another was not would often result in hair splitting distinctions which would be difficult, if not impossible, to reconcile. Each classification made by the board or court would be an invitation to litigate in the next controversy, for there would always be the hope that the device involved would fall on the other side of the line. Numerous decisions instead of bringing certainty into the statute would only create confusion. It is to be remembered that this is a taxing statute which has to be administered in a practical way by local boards of assessors. To place a construction on it that would challenge the dialectic ingenuity of a medieval philosopher could hardly have been intended by the Legislature. Even under our construction there will still be difficulties. In these days when so many things are done with the aid of mechanical devices of one sort or another vexing questions as to whether a given device can be classed as a machine or machinery will undoubtedly arise. But the present construction seems to us to furnish a practical working guide."
J.J. Newberry Co., 330 Mass. at 472-473, 115 N.E.2d 139.
The salient question before us then is whether, as the board found, the pipes at issue in this case are in fact exempt machinery.
3. Continued efficacy of the great integral machine doctrine. The great integral machine doctrine relied on by the board precedes **118 the Legislature's exemption for machinery used in manufacturing and stems from this court's holding in Lowell Gas Light Co., 12 Allen at 78-79. In that case, the question was whether, in ascertaining the State tax to be assessed upon a corporation established for the purpose of making and supplying gas, the commissioners appointed to value the corporation's shares or capital stock, and to deduct therefrom the value of the corporation's real estate and machinery (which at the time were taxed locally), had erred in determining that certain mains and pipes used for distributing gas throughout the city were not "machinery" and that, therefore, their value was not deductible. Id.
We considered that the corporation had been established "for the purpose of manufacturing and disposing of gas," and that "[t]he mains or pipes laid down in the streets and elsewhere to distribute the gas among those who [were] to consume it were clearly a part of the apparatus necessary to be used by the corporation in order to accomplish the object for which it was established." Id. at 78. We reasoned that the mains and pipes
"constituted a part of the machinery by means of which the corporate business was carried on, in the same manner as pipes attached to a pump or fire-engine for the distribution of water, or wheels in a mill which communicate motion to looms and spindles, or the pipes attached to a steam-engine to convey and distribute heat and steam for manufacturing purposes, make a portion of the machinery of the mill in which they are used."
Id. We added,
"in a broad, comprehensive and legitimate sense, the entire apparatus by which gas is manufactured and distributed for consumption throughout a city or town constitutes one great integral machine, consisting of retorts, station-meters, gas-holders, street-mains, service-pipes and consumers' meters, all connected and operating together, by means of which the initial, intermediate and final processes are carried on, from *776 its generation in the retort to its delivery for the use of the consumers."
Id. at 78-79. We concluded that because the mains and pipes in that case were "a part of the machinery by means of which the corporate business was carried on," and in fact operated as "one great integral machine," the value of the mains and pipes was **119 includable for purposes of the deduction. Id. See Assessors of Springfield v. Commissioner of Corps. & Taxation, 321 Mass. 186, 190-192, 72 N.E.2d 528 (1947) (telephone company's "machinery, poles, wires and underground conduits, wires and pipes" not exempt as "one great integral machine" because property not "machinery employed in any branch of manufacture"). See also Dudley v. Jamaica Pond Aqueduct Corp., 100 Mass. 183, 184 (1868) ("A gas company is strictly a manufacturing corporation, and comes within the letter as well as the spirit of the [statute compelling local taxation of machinery employed in any branch of manufacture]. Instead of sending its manufacture to its customers in packages, or by other vehicles, it distributes it through pipes which are connected with and form a necessary appendage to its works").
Ninety years later, we acknowledged the continued efficacy of the great integral machine doctrine in Boston Gas Co. v. Assessors of Boston, 334 Mass. 549, 565, 137 N.E.2d 462 (1956). In that case, we considered whether a gas manufacturing and distribution corporation's "gas meters, engines, compressors, and station governors, and electric meters and transformers" were "machinery used in manufacture" subject to local taxation. Id. at 562, 137 N.E.2d 462. We reiterated the holding in Lowell Gas Light Co., 12 Allen at 78-79, stating that it "is a square holding that the mains, pipes, and meters were 'machinery employed in any branch of manufacture,' " and noted:
"To us in 1956, [it] may seem like a curious type of machine, and as an original proposition we might have difficulty in conceiving of consumers' meters, for example, as part of such a machine or as machinery used in manufacture. The Lowell Gas decision has, however, stood for ninety years unaffected by legislation."
Boston Gas Co., supra at 565, 137 N.E.2d 462. We stated that we were bound by the holding in Lowell Gas Light Co. and concluded that the disputed property was machinery used in manufacture subject to local taxation. Id.
Thereafter, in Lowell Gas Co., 377 Mass. at 256, 385 N.E.2d 991, we considered whether purchases of "gas mains, gas services, gas meters and meter installations" installed by gas manufacturing and distribution corporations as components of their gas distribution systems were subject to sales and use tax where sales of "machinery ... used directly and exclusively ... in the furnishing of gas, water, steam or electricity when delivered to consumers through mains, lines or pipes" would be exempt from such tax. See **120 G. L. c. 64H, § 6. We noted that taxing statutes should receive a "practical construction," and that "[t]here is no requirement that this type of exemption be interpreted narrowly." Id. at 259, 385 N.E.2d 991, quoting Courier Citizen Co. v. Commissioner of Corps. & Taxation, 358 Mass. 563, 571, 266 N.E.2d 284 (1971). We framed the critical question as follows: "Does the disputed item operate harmoniously with the admittedly exempt machinery to make an integrated and synchronized system?" Lowell Gas Co., supra at 260, 385 N.E.2d 991. With that in mind, we determined that the gas pipes and meters functioned, along with production, storage, and pressure regulating equipment, "as integral component parts required in the gas furnishing system," and as a result, were in fact exempt machinery. *777 Id. We noted that our holding was consistent with our holding in Lowell Gas Light Co., 12 Allen at 78-79, as well as our holding in Boston Gas Co., 334 Mass. at 562-565, 137 N.E.2d 462, notwithstanding the fact that those cases dealt with different tax statutes. Lowell Gas Light Co., supra at 261 n.11. See Warner Amex Cable Communications, Inc. v. Assessors of Everett, 396 Mass. 239, 241, 485 N.E.2d 177 (1985) (restating great integral machine doctrine and declining to extend it beyond manufacturing context).
As we noted in Boston Gas Co., the great integral machine doctrine, while perhaps more expansive than what we might conceive of today were we manufacturing the principle from scratch, has stood unaffected by legislation for well over one hundred years. The assessors' argument that the doctrine was effectively abrogated by the Legislature's subsequent addition of "poles, underground conduits, wires and pipes" to the list of exceptions from the exemption, which already included real estate and machinery used in manufacture, is belied entirely by the fact that this court continued to apply the doctrine notwithstanding the change. St. 1921, c. 486, § 16 (inserting "poles, underground conduits, wires and pipes" in G. L. c. 59, § 5, Sixteenth). Indeed, we applied the doctrine as recently as 1956 and discussed the doctrine as recently as 1985. See Warner Amex Cable Communications Inc., 396 Mass. at 241, 485 N.E.2d 177 (declining to extend great integral machine doctrine beyond manufacturing context); Boston Gas Co., 334 Mass. at 562-565, 137 N.E.2d 462 (applying great integral machine doctrine). In short, we observe no persuasive reason to dismantle or alter the doctrine, or to restrict its application at this time; that is the purview of the Legislature alone. See Lynn Sand & Stone Co., 360 Mass. at 599, 277 N.E.2d 97 ("If the broad purpose of the [machinery exemption] ... is to be limited, that is a matter for **121 legislative action"). See also Commissioner of Revenue v. Gillette Co., 454 Mass. 72, 76, 907 N.E.2d 629 (2009) (tax incentive statutes "must be fairly construed and reasonably applied in order to effectuate the legislative intent and purpose to promote the general welfare of the Commonwealth" [citation omitted] ). In matters of taxation, consistency in application is of particular import. See Verizon New England Inc. v. Assessors of Boston, 81 Mass. App. Ct. 444, 452, 963 N.E.2d 1210 (2012) ("we have grave doubts about judicial power to alter an established construction of a [tax] statute under circumstances like those this case presents and about the wisdom of doing so even if the power exists"); id. at 450, 963 N.E.2d 1210, quoting Boston v. Mac-Gray Co., 371 Mass. 825, 828, 359 N.E.2d 946 (1977) ("In matters of taxation [we] should follow the pattern of [our] decisions, leaving to the Legislature the opportunity to make responsive adjustments in the scope of the tax statutes").
Having concluded that the great integral machine doctrine enjoys continued vitality, we further conclude that the board based its decision in this case on both substantial evidence and a correct application of the law. See AA Transp. Co., 454 Mass. at 118, 907 N.E.2d 1090 (board decision based on substantial evidence and correct application of law will not be disturbed). We are without reason to disturb the board's determinative finding, drawn from the extensive testimony of the energy system operations expert, that Veolia's pipes and appurtenant equipment "formed an essential part of a single integrated machine." See Assessors of Springfield, 321 Mass. at 190, 72 N.E.2d 528 (board's finding that property was not machinery employed in any branch of manufacture "must stand unless vitiated by error of law"). See also *778 Boston Edison Co., 310 Mass. at 676, 39 N.E.2d 584 (board's decision final as to findings of fact). Where the board's application of clause 16 (3) was entirely reasonable, we affirm.[8] See AA Transp. Co., supra at 119, 907 N.E.2d 1090 (court will affirm board's interpretation if it is reasonable).
Conclusion. In this case, we agree with the reasoning of the **122 board in all material respects and discern no basis for disturbing its decision. Accordingly, we affirm.
So ordered.

In fiscal year (FY) 2014, the board of assessors of Boston (assessors) valued the subject property at $62,910,630, and assessed a tax at a rate of $31.18 per $1,000 of the assessed value, amounting to $1,961,553.44 in total taxes due. See G. L. c. 59, §§ 18, 38 ; G. L. c. 63, § 39.

At all times relevant to the fiscal year at issue, the Commissioner of Revenue (commissioner) classified Veolia Energy Boston, Inc. (Veolia), as a manufacturing corporation within the meaning of G. L. c. 63, §§ 39 and 42B, and 830 Code Mass. Regs. § 58.2.1. General Laws c. 58, § 2, provides a procedure to challenge a manufacturing classification made by the commissioner; the assessors did not avail themselves of this procedure for the times relevant to the fiscal year at issue, although they have done so with respect to Veolia's manufacturing classification effective January 1, 2016.

The Appellate Tax Board (board) issued its decision concerning Veolia's appeal from the denial of its request for abatement in FY 2014 on November 18, 2016. The assessors then requested findings of fact and a report under G. L. c. 58A, § 13, and 831 Code Mass. Regs. § 1.32 (2007), which the tax board subsequently issued on June 5, 2018.

The assessors also place particular emphasis on the fact that Veolia does not own every part of the networks, suggesting that Veolia should not receive an exemption with respect to a network that is, at least in part, owned and used by entities other than Veolia. The assessors, however, have provided no persuasive authority in support of their position. Further, as we stated in Boston Gas Co. v. Assessors of Boston, 334 Mass. 549, 565, 137 N.E.2d 462 (1956), "[t]here is no requirement that 'one great integral machine' be exclusively owned by a single company any more than that it be contained within the boundaries of a single municipality."

In accordance with G. L. c. 59, § 5, Sixteenth (1), certain corporations that are not also manufacturing corporations are exempt from tax on their property except for "real estate, poles, underground conduits, wires, pipes and machinery used in manufacture or in supplying or distributing water."

"One of the purposes of the corporate franchise tax, which has continued since the enactment of St. 1864, c. 208, was to prevent the evasion of taxes by the nonresident holders of stock, and this was accomplished by eliminating a direct tax upon the shares and substituting an excise upon the corporation." Commissioner of Corps. & Taxation v. Springfield, 321 Mass. 31, 40, 71 N.E.2d 593 (1947). "In order to reimburse the cities and towns for the loss resulting from the abolition of a property tax upon the shares, it was provided that they should share in the distribution of the new excise tax collected by the Commonwealth in the same proportion as if they had been permitted to assess the tax on the shares ...." Id.

The Legislature employed a similar tactic, briefly exempting machinery used to manufacture cotton, wool, and textiles in the early 1800s with the aim of encouraging textile production in the Commonwealth. See St. 1828, c. 143. See generally P. Nichols, Taxation in Massachusetts 235 (3d ed. 1938).

To the extent that the assessors suggest that Veolia cannot benefit from the exemption because some portions of the networks are owned or used by "non-manufacturing entities" that "do[ ] not qualify for Clause 16(3) treatment," the assessors have not provided any authority for this position and have not persuaded us to adopt it. It is undisputed that Veolia owns the property at issue in this case -- the assessors have not made clear how applying the exemption to this property will have the effect of allowing otherwise taxable property to "escape taxation."